UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GUY CARPENTER & COMPANY, LLC,

> Plaintiff,

v.

MICHAEL JAMESON, MATTHEW BEARD,
KENNETH DURBIN, ZACHARY WILSON,
and KYLE GOEKE,

> Defendants.

Case No. 22-cv-7032

**COMPLAINT**

Plaintiff Guy Carpenter & Company, LLC ("Guy Carpenter" or the "Company"), by and through its counsel, Gibson, Dunn & Crutcher LLP, as and for its Complaint against Michael Jameson, Matthew Beard, Kenneth Durbin, Zachary Wilson, and Kyle Goeke (collectively, "Defendants"), alleges as follows:

**INTRODUCTION**

1.      This action arises from a coordinated and concealed plan to steal an entire business unit from Guy Carpenter.  This methodical raid of Guy Carpenter's business unit included not only a majority of its employees (including Defendants), but also its clients and confidential information.   Armed with Guy Carpenter's confidential information, knowledge of Guy Carpenter's business practices, and the goodwill of its clients that Guy Carpenter spent years and millions of dollars developing, Defendants—while still employed by Guy Carpenter—laid the groundwork to quickly launch the first U.S. office of one of Guy Carpenter's direct competitors, Howden Reinsurance Brokers Limited ("Howden").  Rather than invest its own time and resources to develop one, Howden, through Defendants, simply pillaged the majority of the GC Access team to compete directly with Guy Carpenter, without any of the requisite acquisition costs.  The scheme culminated in a group meeting of departing Guy Carpenter employees, along with Howden

executives, in a private room of an upscale Dallas restaurant, where Defendants and seven other GC Access employees simultaneously resigned.  Defendants, however, should not be permitted to unfairly compete at no cost to them or their new employer, Howden.  Defendants must pay the price for their illegal conduct.

2.      Guy Carpenter is a leading reinsurance broker.  Over the past five years, Guy Carpenter has invested in building a dedicated platform in the specialized Managing General Agent ("MGA") reinsurance broker business, known as the "GC Access" business unit.  Defendants are all former employees in the GC Access unit who participated in an unlawful raid to steal GC Access's key employees, clients, and confidential information to unfairly benefit one of Guy Carpenter's direct competitors, Howden.  This coordinated raid involved the simultaneous defection of twelve GC Access employees, including its top leadership, and over twenty accounts with GC Access clients—resulting in millions of dollars in lost revenue—to instantly create a mirror image business to the one Guy Carpenter had spent years building.  Through their actions in furtherance of this raid, Defendants violated numerous obligations to Guy Carpenter, including, but not limited to, their non-solicitation agreements, non-disclosure and confidentiality agreements, and fiduciary duties.  These actions have inflicted, and continue to inflict, substantial damages and irreparable harm, as Defendants continue to poach growing numbers of clients to leave Guy Carpenter for Howden.

3.      Howden is based in the United Kingdom and has historically had no presence in the United States—let alone a specialized MGA reinsurance broker business in the United States.  Rather than investing time and resources to build a U.S. presence of its own (as Guy Carpenter did) and competing fairly in the marketplace, Howden's executives hatched an unlawful scheme to steal GC Access's employees, clients, and confidential information.  But Howden could not

execute its scheme without help from the inside.  Howden and its principals enlisted senior executives and key employees in the GC Access Unit—including its then President and Managing Director, Michael Jameson, and key leaders Matthew Beard, Kenneth Durbin, Zachary Wilson, and Kyle Goeke—to recruit top-performing employees to leave Guy Carpenter for Howden and to provide Howden with confidential personnel and compensation information about such employees.  Defendants leveraged confidential information about GC Access's workforce, and shared this information with Howden, in order to recruit these employees to join Howden.

4.     After many months of planning, the raid of the GC Access unit was revealed on April 25, 2022.  That morning, Defendants, along with seven other GC Access employees and Howden's senior executives, gathered in a private room at the Mansion on Turtle Creek, a high-end hotel and restaurant in Dallas.  At this meeting, Defendants worked together with Howden's senior executives to make their final push to encourage and assist the GC Access employees to resign from Guy Carpenter and join Howden.  Once they were in agreement to do so, Defendants and the seven other GC Access employees drafted resignation emails to Guy Carpenter, which each of them tendered near-simultaneously to Guy Carpenter.  Later that day, this same group met to celebrate the raid of the GC Access unit at Au Troisième, a Dallas restaurant that had not yet opened to the public, and in which Jameson was an investor.  This carefully calculated raid, with the cherry-picking of more than half of the GC Access team and utilizing confidential details about their employment with Guy Carpenter to entice them to leave, constituted a clear violation of the fiduciary duties and contractual obligations Defendants owed to Guy Carpenter.

5.     Defendants' solicitation of each other and other Guy Carpenter employees did not end with this coordinated mass exodus, or even after those employees were formally terminated

by Guy Carpenter about one month later.[1]  Defendants have continued their efforts to solicit current Guy Carpenter employees who did not resign on April 25 well after the raid in blatant violation of their non-solicitation agreements.  For example, on June 9, 2022, after a night of apparent partying, Jameson and a group of the other employees who left Guy Carpenter for Howden called a current Guy Carpenter employee to tell him that he should come to Howden and asked why he was still at Guy Carpenter.

6.  Defendants' raid was not limited to just Guy Carpenter's employees.  It also targeted established GC Access clients that Defendants solicited both while they were still employed by Guy Carpenter and afterward—in direct violation of Defendants' non-solicitation agreements and other legal duties.  In fact, ***the day the raid occurred***—April 25, 2022—a current Guy Carpenter client attending the Auto Insurance Report National Conference in Dana Point, California bragged that she had "known about this [*i.e.*, the resignations] for weeks" because Durbin had been talking to her about the imminent move and asking her to move her business to Howden.  And ***the day after the coordinated raid***—April 26, 2022—one of Guy Carpenter's longstanding clients, whose main contact at Guy Carpenter was Jameson, announced that it was moving all of its business to Howden.  Since then, other Guy Carpenter clients have followed suit, announcing plans to move their business to Howden, resulting in millions of dollars in lost revenue for Guy Carpenter.

7.  Defendants' theft of Guy Carpenter's most prized assets, including its personnel and clients, in such a coordinated manner would have been impossible without the use—or more aptly, misuse—of Guy Carpenter's confidential information and trade secrets, including, but not

---

[1]  Defendants had contractual notice periods of 60 days, so they were required to remain Guy Carpenter employees following their simultaneous resignations until the earlier of the end of the 60-day period or a prior date of Guy Carpenter's choosing.

limited to, personnel information and sensitive client data, which is and was protected from disclosure pursuant to Defendants' contracts with Guy Carpenter. Defendants misappropriated this confidential information for the benefit of themselves and their new employer, Howden. Among other examples, Jameson stole confidential trade secret information for Howden through uploading files to a third-party cloud server; days before resigning, Beard misappropriated confidential Guy Carpenter presentations; and Durbin—just a few days before resigning from Guy Carpenter—reviewed and misappropriated highly confidential information about prospective Guy Carpenter business opportunities and expected revenue tied to those opportunities.

8.     Defendants' illegal actions have forced Guy Carpenter to commence this action to stop Defendants' ongoing misconduct and to remedy the harm they have already inflicted on Guy Carpenter. The fact pattern here is as egregious and clear cut as any presented in cases of this type—in fact, one leading trade publication described Howden's and Defendants' conduct as an "audacious raid." After Guy Carpenter invested five years and substantial sums in building a specialized MGA business unit, Defendants unleashed a plot of unfair competition to steal that business for a competitor. While Guy Carpenter embraces fair, full, and robust competition in a free market, Defendants are competing unfairly—and in violation of their contractual duties and other legal obligations. Guy Carpenter therefore seeks injunctive relief to stop Defendants' ongoing tortious conduct and contractual breaches, and money damages for the harm inflicted on Guy Carpenter.

## THE PARTIES

9.     Guy Carpenter was founded in 1922 and is a leading international reinsurance broker. Guy Carpenter provides an array of services for its clients, including reinsurance brokering, capital solutions, strategic advisor services, and analytics. Guy Carpenter is a Delaware limited liability company, whose sole member is Marsh USA Inc., a Delaware corporation, with

its principal place of business in New York, New York.

10.     Defendants were employed by Guy Carpenter and executed binding agreements in connection with their employment, which included, *inter alia*, non-solicitation and non-disclosure covenants.  Defendants all worked in the GC Access business unit at Guy Carpenter.  Defendants and seven other GC Access employees (collectively, the "Departing Employees"), all submitted resignation notices nearly simultaneously on the morning of April 25, 2022, and are now working for Howden, a direct competitor.  Since the twelve Departing Employees resigned from Guy Carpenter, a growing number of clients of the GC Access business unit have followed suit and cut ties with Guy Carpenter.  These clients have taken their business to Howden and appointed Howden as their Brokers of Record.

11.     Defendant Michael Jameson is an individual who is a resident of Dallas County, Texas.  Jameson began his employment at Guy Carpenter on January 9, 2017.  Before commencing his employment with Guy Carpenter, on December 12, 2016, Jameson agreed to a Notification, Non-Solicitation and Confidentiality Agreement, attached hereto as Exhibit A.  In addition, by accepting restricted stock units, Jameson agreed to be bound by a Restrictive Covenants Agreement.  *See* Ex. F (2021 Jameson Restricted Stock Unit Agreement); Ex. J (Restrictive Covenants Agreement).  Jameson tendered a resignation letter on April 25, 2022, and his employment at Guy Carpenter was terminated on May 24, 2022.  After leaving Guy Carpenter, Jameson commenced employment at Howden.

12.     Defendant Matthew Beard is an individual who is a resident of Dallas County, Texas.  Beard began his employment at Guy Carpenter on June 4, 2018.  Before commencing his employment with Guy Carpenter, on June 1, 2018, Beard agreed to a Notification, Non-Solicitation and Confidentiality Agreement, attached hereto as Exhibit B.  In addition, by accepting restricted

stock units, Beard agreed to be bound by a Restrictive Covenants Agreement.  *See* Ex. G (2021 Beard Restricted Stock Unit Agreement); Ex. J (Restrictive Covenants Agreement).  Beard tendered a resignation letter on April 25, 2022, and his employment at Guy Carpenter was terminated on May 26, 2022.  After leaving Guy Carpenter, Beard commenced employment at Howden.

13.     Defendant Kenneth Durbin is an individual who is a resident of Dallas County, Texas.  Durbin began his employment at Guy Carpenter on January 16, 2017.  Before commencing his employment with Guy Carpenter, on December 15, 2016, Durbin agreed to a Notification, Non-Solicitation and Confidentiality Agreement, attached hereto as Exhibit C.  In addition, by accepting restricted stock units, Durbin agreed to be bound by a Restrictive Covenants Agreement. *See* Ex. H (2021 Durbin Restricted Stock Unit Agreement); Ex. J (Restrictive Covenants Agreement).  Durbin tendered a resignation letter on April 25, 2022, and his employment at Guy Carpenter terminated on May 26, 2022.  After leaving Guy Carpenter, Durbin commenced employment as the Managing Director, Head of Strategy—Global Programs at Howden.

14.     Defendant Zachary Wilson is an individual who is a resident of Fulton County, Georgia.  Wilson began his employment at Guy Carpenter on March 13, 2017.  On March 13, 2017, Wilson agreed to a Notification, Non-Solicitation and Confidentiality Agreement, attached hereto as Exhibit D.  In addition, by accepting restricted stock units, Wilson agreed to be bound by a Restrictive Covenants Agreement. *See* Ex. I (2021 Wilson Restricted Stock Unit Agreement); Ex. J (Restrictive Covenants Agreement).  Wilson tendered a resignation letter on April 25, 2022, and his employment at Guy Carpenter terminated on May 26, 2022.  After leaving Guy Carpenter, Wilson commenced employment as a Managing Director at Howden.

15.     Defendant Kyle Goeke is an individual who is a resident of Tarrant County, Texas.

Goeke began his employment at Guy Carpenter on November 4, 2020.  Before commencing his employment with Guy Carpenter, on October 15, 2020, Goeke agreed to a Notification, Non-Solicitation and Confidentiality Agreement, attached hereto as Exhibit E.  Goeke tendered a resignation letter on April 25, 2022, and his employment at Guy Carpenter terminated on May 26, 2022.  After leaving Guy Carpenter, Goeke commenced employment as a Managing Director at Howden.

### JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship among the parties and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of costs and interest.

17.     This Court has also subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises in part under federal law—the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* This Court has supplemental jurisdiction over Guy Carpenter's state law claims pursuant to 28 U.S.C. § 1367.

18.     This Court has personal jurisdiction over Defendants because Defendants consented to the jurisdiction of this Court in their Notification, Non-Solicitation and Confidentiality Agreements and Restrictive Covenants Agreements.  *See* Exs. A–D (Jameson, Beard, Durbin, Wilson NNCAs) § 7(j); Ex. E (Goeke NNCA) § 7(k); Ex. J (RCA) § 12.  This Court also has specific jurisdiction over Defendants because Defendants transacted business with Guy Carpenter, whose sole member maintains its principal place of business in New York, New York, and Guy Carpenter's claims arise from those transactions.

19.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this District and because Defendants consented to venue in this District in their Notification, Non-Solicitation and Confidentiality

Agreements and Restrictive Covenants Agreements.   *See* Exs. A–D (Jameson, Beard, Durbin,

Wilson NNCAs) § 7(j); Ex. E (Goeke NNCA) § 7(k); Ex. J (RCA) § 12.

## FACTUAL BACKGROUND

**I.      Guy Carpenter Invests in and Builds the GC Access Business Unit into a Leader in the Managing General Agent Market.**

20.      Defendants worked in a business unit at Guy Carpenter known as "GC Access,"

which is Guy Carpenter's dedicated Managing General Agent, or MGA, platform.  Over the past

five years, Guy Carpenter has invested significant time, millions of dollars, and substantial

resources to build the GC Access business unit into a leader within its niche market and to develop

and train the employees within the unit.

21.      After years of strategic positioning and significant investment in the MGA market,

Guy Carpenter launched GC Access in 2020 to provide fully integrated services to MGAs,

including carrier and reinsurance transactions, captive support, insurtech expertise, and program

startup roadmaps.  GC Access helps clients develop fully optimized program solutions, combining

focused expertise, market-leading analytical capabilities, global reach, and an expansive network

of insurer and reinsurer relationships to precisely and efficiently match MGAs and carriers.

Significantly, prior to April 2022, Howden had no similar presence in the MGA market in the

United States.

22.      Prior to the raid, approximately twenty Guy Carpenter employees, including

Defendants, were primarily dedicated to the GC Access platform.  As part of this specialized group,

those employees benefitted from extensive training, client development resources, and cross-

selling provided to them by Guy Carpenter.  All twelve of the Departing Employees provided

services to the GC Access unit, meaning Defendants' coordinated raid stole the majority of the

employees in the group.  Defendants have also tried unsuccessfully to recruit several of the

remaining members of the GC Access unit.

23.     Employees in GC Access utilize Guy Carpenter's global reach and confidential company and industry knowledge to build their niche practice.  As a result, the employees within this business unit have access to significant commercially sensitive and confidential information.  This includes information about clients, prospective clients, growth opportunities, pricing, and terms and conditions of contracts with clients.  These employees also have intimate knowledge of confidential and proprietary information about GC Access's workforce, including employees' relative strengths and potential, various areas of expertise, and relationships with current or potential clients.

24.     This commercially sensitive and confidential information is vital to the success of GC Access, as information about prospective clients, competitive pricing, and growth opportunities are of paramount importance in this highly competitive industry.  Such detailed, proprietary market research and analytics provide Guy Carpenter with significant competitive advantages.  Guy Carpenter went to great lengths at enormous expense to collect and refine this market data and other information to benefit its business relative to its competitors, giving it a strong competitive advantage.

25.     GC Access employees also have access to a number of confidential and trade secret proprietary tools, used for business analytics and actuarial services.  For example, certain of the Departing Employees utilized a Guy Carpenter-developed program called MetaRisk, which is part of an end-to-end suite of risk assessment and capital modeling tools, offering analytics related to underwriting, reserving, catastrophe, credit, and investment risk.  MetaRisk and other proprietary Guy Carpenter analytics and actuarial tools allow GC Access the proprietary ability to synthesize and analyze confidential information from various sources, including client business plans,

financial records, performance metrics, balance sheets, and other sensitive client business records.

26.     Guy Carpenter has made significant efforts to ensure that employees and former employees do not use or disseminate confidential information or trade secrets for the benefit of competitors.   Among other measures, Guy Carpenter requires all employees to sign various agreements and policies to protect such information.

## II.     Guy Carpenter Trains the Departing Employees, Including Defendants, and Grants Them Access to Guy Carpenter's Confidential and Proprietary Information and Strategies.

27.     Guy Carpenter invested significant resources and expertise in training and developing the Departing Employees—all of whom were specialized in the MGA business and dedicated to the GC Access unit—including through extensive trainings, client development resources, and cross-selling provided by Guy Carpenter.   In addition, all of the Departing Employees had access to Guy Carpenter confidential information, as detailed below.

### *Defendants*

*Michael Jameson*

28.     From January 9, 2017 to May 24, 2022, Guy Carpenter employed Jameson as a Managing Director in its office located in Dallas, Texas.   Jameson became the President of the GC Access business unit when it launched in October 2020.   As President of the GC Access business unit, Jameson was responsible for overseeing all activities across the unit.   Prior to his role as President of the GC Access unit, Jameson served as Head of Guy Carpenter's Program Division.

29.     As President of the GC Access business unit, Jameson held a position of influence and trust within Guy Carpenter with accompanying responsibilities.   He had extensive management responsibilities and was involved in some capacity in all of the GC Access business unit's initiatives, business offerings, and client relationships.  Jameson met with the Guy Carpenter executive committee as the representative and leader of the GC Access unit.   As such, Jameson

11

had access to highly confidential information, including full access to the GC Access portfolio. Jameson also supervised and worked closely with many Guy Carpenter employees.  As the head of the GC Access unit, he had ultimate personnel responsibility for virtually all employees in this business unit.  In addition, Jameson had significant, daily interactions with GC Access clients and potential clients.

30.     Jameson reported primarily to Alexander van Dijk, one of the three Presidents of Guy Carpenter North America, and also indirectly reported to the highest executive at Guy Carpenter—the CEO of North America, John Trace.

*Matthew Beard*

31.     From June 4, 2018 to May 26, 2022, Guy Carpenter employed Matthew Beard as a Managing Director for GC Access in its office located in Dallas, Texas.  Beard reported to Jameson.

32.     As Managing Director, Beard held a position of influence and trust with accompanying responsibilities and fiduciary duties.  As Managing Director, he was involved in some capacity in all of the GC Access business unit's initiatives, business offerings, and client relationships.  In connection with his position, he worked on numerous client teams, made critical business introductions, and was intimately involved in prospecting.  Moreover, Beard had access to the confidential information of the Company's clients, markets, and personnel.  Beard's involvement in these activities and access to the Company's confidential information extended well beyond the Dallas office through his work with Company clients and employees across the United States as well as internationally.

*Kenneth Durbin*

33.     From January 16, 2017 to May 26, 2022, Guy Carpenter employed Kenneth Durbin

as a Senior Vice President of North America Broking for GC Access in its office located in Dallas, Texas.  Durbin reported to Jameson.

34.     As Senior Vice President, Durbin held a position of influence and trust with accompanying responsibilities and fiduciary duties.  As Senior Vice President, he was involved in some capacity in all of the GC Access business unit's initiatives, business offerings, and client relationships.  In connection with his position, he worked on numerous client teams and made critical business introductions.  Moreover, Durbin had access to the confidential information of the Company's clients, markets, and personnel.  Durbin's involvement in these activities and access to the Company's confidential information extended well beyond the Dallas office through his work with Company clients and employees across the United States as well as internationally.

*Zachary Wilson*

35.     From March 13, 2017 to May 26, 2022, Guy Carpenter employed Zachary Wilson as a Senior Vice President for GC Access in its office located in Atlanta, Georgia.  Wilson reported to Jameson.

36.     As a Senior Vice President, Wilson held a position of influence and trust with accompanying responsibilities and fiduciary duties.  As a Senior Vice President, he was involved in some capacity in all of the GC Access business unit's initiatives, business offerings, and client relationships.  In connection with his position, he worked on numerous client teams and made critical business introductions.  Moreover, Wilson had access to the confidential information of the Company's clients, markets, and personnel.  Wilson's involvement in these activities and access to the Company's confidential information extended well beyond Atlanta through his work with Company clients and employees across the United States as well as internationally.

*Kyle Goeke*

37.     From November 4, 2020 to May 26, 2022, Guy Carpenter employed Kyle Goeke in its office located in Dallas, Texas.  Goeke was a Vice President of GC Access until April 2022 when he was promoted to Senior Vice President.  Goeke reported to Jameson.

38.     As a Senior Vice President, Goeke held a position of influence and trust with accompanying responsibilities and fiduciary duties.  He was involved in some capacity in all of the GC Access business unit's initiatives, business offerings, and client relationships.  Moreover, Goeke had access to highly confidential information, including client information.  Goeke also worked closely with many Guy Carpenter employees, including most, if not all, of the Departing Employees.  In addition, Goeke had significant, daily interactions with GC Access clients and potential clients.

### ***Other Departing Employees***

*James Matusiak*

39.     From November 2, 2020 to May 26, 2022, Guy Carpenter employed James Matusiak as a Senior Vice President for GC Access in its office located in Dallas, Texas.

40.     As a Senior Vice President, Matusiak held a position of influence and trust with accompanying responsibilities and fiduciary duties.  As a Senior Vice President, he was involved in some capacity in all of the GC Access business unit's initiatives, business offerings, and client relationships.  Moreover, Matusiak had access to highly confidential information, including client information.  Matusiak also worked closely with many Guy Carpenter employees, including most, if not all, of the Departing Employees.  In addition, Matusiak had significant, daily interactions with GC Access clients and potential clients.

*Andrew Hardee*

41.     From April 15, 2019 to May 26, 2022, Guy Carpenter employed Andrew Hardee as a Vice President for GC Access in its office located in Dallas, Texas.  As a Vice President, Hardee had access to confidential information about the Company's clients, markets, and personnel.

*Benjamin Williams*

42.     From January 21, 2019 to May 26, 2022, Guy Carpenter employed Benjamin Williams as an Assistant Vice President for GC Access in its office located in Dallas, Texas.  As an Assistant Vice President, Williams had access to confidential information about the Company's clients, markets, and personnel.

*Barrett Skeeter*

43.     From June 24, 2019 to May 26, 2022, Guy Carpenter employed Barrett Skeeter as an Assistant Vice President for GC Access in its office located in Dallas, Texas.  As an Assistant Vice President, Skeeter had access to confidential information about the Company's clients, markets, and personnel.

*Bennett Brock*

44.     From August 2, 2021 to May 26, 2022, Guy Carpenter employed Bennett Brock as a Risk Analyst in the Brokering Department for Guy Carpenter/GC Access in its office located in Dallas, Texas.   As a Risk Analyst, Brock had access to confidential information about the Company's clients, markets, and personnel.

*Mayda Arista*

45.     From September 9, 2019 to May 26, 2022, Guy Carpenter employed Mayda Arista as a Technical Support Assistant in the Brokering Support Services Department for GC Access in

its office located in Dallas, Texas.  As a Technical Support Assistant, Arista had access to confidential information about the Company's clients, markets, and personnel.

*Oliver Ferrari*

46.     Beginning on September 13, 2013, Guy Carpenter employed Oliver Ferrari as a Senior Vice President for Guy Carpenter/GC Access in its office located in London, United Kingdom.[2]

### III.   Defendants Owed Contractual and Fiduciary Obligations to Guy Carpenter Relating to Its Employees, Clients, and Other Confidential Information.

47.     To protect its essential investments in its employee and client relationships and to safeguard the confidentiality of its other trade secrets and proprietary information, Guy Carpenter entered into a series of industry-standard Notification, Non-Solicitation and Confidentiality Agreements with each of the Defendants (the "Agreements").  These Agreements are governed by New York law.  Exs. A–D (Jameson, Beard, Durbin, Wilson NNCAs) § 7(j); Ex. E (Goeke NNCA) § 7(k).

48.     Under the Agreements, Defendants have clear and straightforward obligations to protect Guy Carpenter's legitimate business interests, including the confidentiality of Guy Carpenter's proprietary information and trade secrets, knowledge of Guy Carpenter's business practices, and goodwill with clients.

### *Non-Solicitation of Guy Carpenter Clients and Employees*

49.     In the Agreements, Defendants agreed to be bound by non-solicitation covenants prohibiting the solicitation of Guy Carpenter clients and employees for a period of one year following their termination of employment.  These non-solicitation covenants are substantially

---

[2]  Due to a longer resignation notice period under Ferrari's UK employment agreement, Ferrari remains a Guy Carpenter employee, on garden leave from the company.

similar, though there are minor differences in the language of the covenants.

50.     In particular, Jameson, Beard, Durbin, and Wilson each agreed to be bound by the

following non-solicitation covenant prohibiting the direct or indirect solicitation of Guy Carpenter

clients and employees:

2.   Non-Solicitation of Company Business and Employees

(a)   Employee agrees that if his/her employment with the Company terminates for any reason (regardless of whether such termination is voluntary or involuntary), s/he will not, for a period of one (1) year from date of termination, directly or indirectly, as a sole proprietor, member of a partnership, or stockholder, investor, officer or director of a corporation, or as an employee, agent, associate or consultant of any person, firm or corporation except for the benefit of the Company:

(i)   solicit or accept business of the type offered by the Company during his/her term of employment with the Company, or perform, participate in, or supervise the performance of any services related to such type of business, from or for (i) clients or prospects of the Company or its affiliates who were solicited or serviced directly by Employee or where s/he supervised or participated in, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such clients or prospects within two (2) years prior to his/her termination of employment; or (ii) any former client of the Company or its affiliates who was a client within two (2) years prior to my termination and who was solicited or serviced directly by Employee or where Employee supervised or participated in, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such former clients; or

(ii)   solicit, induce, or encourage, or assist others in soliciting, inducing, or encouraging, any employee of the Company or its affiliates to terminate his or her employment with the Company or such affiliate, as applicable, for any reason.

(b)   As used in Section 2(a)(i), "prospects" shall mean any prospective client or customer who Employee solicited, participated in the solicitation of, or supervised the solicitation of at any time during the twelve (12) months preceding the termination of his/her employment.

Exs. A–D (Jameson, Beard, Durbin, Wilson NNCAs) § 2.

51.     In addition, Goeke agreed to be bound by the following non-solicitation covenant

prohibiting the direct or indirect solicitation of Guy Carpenter clients and employees:

2.   Non-Solicitation of Company Business and Employees

(a)  Employee agrees that if his or her employment with the Company terminates for any reason (regardless of whether such termination is voluntary or involuntary), he or she will not, for a period of one (1) year from date of termination, directly or through others, as a sole proprietor, member of a partnership, or stockholder, investor, officer or director of a corporation, or as an employee, agent, associate or consultant of any person, firm or corporation except for the benefit of the Company:

    (i)  solicit or accept business of the type offered by the Company during his or her employment with the Company, or perform, participate in, or supervise the performance or provision of any services related to such type of business, from or for (a) clients or prospects of the Company or its affiliates who were solicited or serviced directly by Employee or where he or she supervised or participated in, directly or through others, in whole or in part, the solicitation or servicing activities related to such clients or prospects; or (b) any former client of the Company who was solicited or serviced directly by Employee or where Employee supervised or participated in, directly or through others, in whole or in part, the solicitation or servicing activities related to such former clients; or

    (ii)  solicit, induce, or encourage, or assist others in soliciting, inducing, or encouraging, any employee of the Company with whom Employee, during the last two (2) years prior to separation from employment with the Company, came into contact for the purpose of soliciting or servicing business or about whom Employee obtained Confidential Information and Trade Secrets to terminate his or her employment with the Company for any reason.

(b)  The restriction in Section 2(a)(i)(a) shall only apply to those clients or prospects of the Company with whom Employee had contact or about whom Employee obtained Confidential Information and Trade Secrets during the two (2) years prior to separation from employment with the Company.

(c)  The restriction in Section 2(a)(i)(b) shall apply only to those former clients of the Company with whom Employee had contact or about whom Employee obtained Confidential Information and Trade Secrets during the two (2) years prior to separation from employment with the Company.

Ex. E (Goeke NNCA) § 2.

### *Non-Disclosure of Confidential Information and Trade Secrets*

52.    Defendants also agreed to be bound by substantially similar provisions prohibiting the use or disclosure of confidential information, except to the extent required to fulfill their employment responsibilities, either before or after the end of their employment with Guy

Carpenter:

### 3. Nondisclosure of Confidential Information

During the period Employee is employed by the Company, Employee agrees that, unless authorized in writing to do so by the chief executive officer of the Company, s/he will not, directly or indirectly, for any purpose whatsoever use, or disclose to any person, Confidential Information, except to the extent required to carry out his/her duties as an employee of the Company.  After termination of his/her employment by the Company, Employee will not, directly or indirectly, for any purpose whatsoever use, or disclose to any person, Confidential Information.

Exs. A–D (Jameson, Beard, Durbin, Wilson NNCAs) § 3; *see also* Ex. E (Goeke NNCA) § 3 (similar).

53.    The Agreements executed by Jameson, Beard, Durbin, and Wilson define "Confidential Information" to include "any and all information in whatever form relating to the Company or any client or prospective client of the Company."  These Agreements state:

As used in this Section, "Confidential Information" shall consist of and include any and all information in whatever form relating to the Company or any client or prospective client of the Company, including but not limited to its/their business, employees, operations, systems, assets, liabilities, finances, resources, clients or prospects, risk management procedures, client insurance programs and the cost thereof, insurance policy terms, policy conditions or rates, policy expiration dates and other financial or risk information about clients, arrangements with insurers and other financial institutions, products, discoveries, databases, computer programs, frameworks, models, methods, marketing practices, selling practices, operating practices, recruiting practices, compensation practices, markets with which clients' risks are placed, intellectual property, and other information that Employee knows or should know is subject to a restriction on disclosure or is considered by the Company or its clients or prospective clients to be confidential.  "Confidential Information" shall also include any information disclosed to Employee or the Company pursuant to a Confidentiality or Non-Disclosure Agreement between the Company and a third party.

Exs. A–D (Jameson, Beard, Durbin, Wilson NNCAs) § 3.

54.    The Agreement executed by Goeke similarly defines "Confidential Information" as "items of information relating to the Company, its products, services, clients, suppliers, vendors, business partners, and employees that are not generally known or available to the general public, but have been developed, compiled or acquired by the Company at its or their great effort and

expense."  That Agreement states:

"Confidential Information and Trade Secrets" are items of information relating to the Company, its products, services, clients, suppliers, vendors, business partners, and employees that are not generally known or available to the general public, but have been developed, compiled or acquired by the Company at its or their great effort and expense. Confidential Information and Trade Secrets can be in any form, including but not limited to: verbal, written or machine readable, including electronic files. . . .  Confidential Information and Trade Secrets include but are not limited to:

i.  financial and business information relating to the Company, such as information with respect to costs, commissions, fees, profits, sales, markets, mailing lists, strategies and plans for future business, new business, product or other development, potential acquisitions or divestitures, and new marketing ideas;

ii.  product and technical information relating to the Company, such as product formulations, new and innovative product ideas, methods, procedures, devices, machines, equipment, data processing programs, software, software codes, computer models, and research and development projects;

iii.  client information of the Company, such as the identity of clients, the names of representatives of clients responsible for entering into contracts with the Company, the amounts paid by such clients, specific client needs and requirements, specific client risk characteristics, policy expiration dates, policy terms and conditions, information regarding the markets or sources with which insurance is placed, and leads and referrals to prospects;

iv.  personnel information of the Company, such as the identity and number of other employees, their salaries, bonuses, benefits, skills, qualifications, and abilities;

v.  any and all information in whatever form relating to any client or prospect of the Company, including but not limited to, its business, employees, operations, systems, assets, liabilities, finances, products, and marketing, selling and operating practices;

vi.  any information not included in (i) or (ii) above which Employee knows or should know is subject to a restriction on disclosure or which Employee knows or should know is considered by the Company or any of their clients or prospects to be confidential, sensitive, proprietary or a trade secret or is not readily available to the public;

vii.  Intellectual Property (as defined above); and

viii.  Copyrightable Works (as defined below).

Ex. E (Goeke NNCA) § 3.

### *Return of Property*

55.    Defendants all agreed to be bound by substantially similar provisions requiring the

return of Guy Carpenter property upon the termination of their employment:

> <u>Return of Materials Upon Termination of Employment</u>.  Immediately upon the termination
> of employment with the Company for any reason, or any time the Company so requests,
> Employee will return to the Company:
>
> (a) any originals and all copies of all files, notes, documents, slides (including
> transparencies), computer disks, printouts, reports, lists of the Company's clients or leads
> or referrals to prospective clients, and other media or property in my possession or control
> which contain or pertain to Confidential Information; and
>
> (b) all property of the Company, including, but not limited to, supplies, keys, access
> devices, books, identification cards, computers, telephones and other equipment.
>
> Employee agrees that upon his/her completion of the obligations set forth in this Section
> 4, paragraphs (a) & (b) above and if requested by the Company, Employee will execute a
> statement declaring that s/he has retained no property of the Company or materials
> containing Confidential Information nor has supplied the same to any person, except as
> required to carry out his/her duties as an employee of the Company.

Exs. A–D (Jameson, Beard, Durbin, Wilson NNCAs) § 4; *see also* Ex. E (Goeke NNCA) § 4
(similar).

### *Jameson's, Beard's, Durbin's, and Wilson's Restrictive Covenants Agreements*

56.    In addition to the Agreements described above, four of the five Defendants—

specifically, Jameson, Beard, Durbin, and Wilson—also entered into Restrictive Covenants

Agreements during the course of their employment, which were generally tied to the grant of

restricted stock units.  In order to receive the restricted stock units, these Defendants agreed to be

bound by the "Restrictive Covenants Agreement (RCA) . . . provided . . . as part of [the] award

documentation."  Exs. F–I (2021 Restricted Stock Unit Agreement for Jameson, Beard, Durbin,

Wilson); *see* Ex. J (RCA).

57.    The Restrictive Covenants Agreements contain identical restrictions related to the

direct or indirect solicitation of clients and Guy Carpenter employees, and make clear that the obligation not to solicit Guy Carpenter employees applies both during and after their employment with Guy Carpenter.  These agreements are governed by New York law.  Ex. J (RCA) § 12.

58.     The Restrictive Covenants Agreements contain a client non-solicitation covenant that is similar to the covenant in the Notification, Non-Solicitation and Confidentiality Agreement. *See* Ex. J (RCA) § 2.

59.     The Restrictive Covenants Agreements include a provision for liquidated damages in the event of a breach of the client non-solicitation covenant:

8.  Liquidated Damages

--

(b)   Recognizing the difficulty of calculating actual damages and acknowledging the factors set forth in Section 8(a), among other factors, in the event of a violation of Section 2, in addition to all other remedies provided herein, if a client subject to the provisions of Section 2 either reduces the amount of business or cancels business with the Company and directs or redirects such business through the Employee or through any entity or person with whom the Employee becomes associated, Employee agrees to pay the Company an amount equal to the total fees and commissions charged by the Company to the client during the two years prior to the breach.  Said amount shall be payable to the Company no later than thirty (30) days following Employee's receipt of the Company's written statement of the total fees and commissions for that client for the prior two years. Employee acknowledges and agrees that this amount is a reasonable approximation of the damages likely to occur following a breach of Section 2.

Ex. J (RCA) § 8(b).

60.     The Restrictive Covenants Agreements contain an additional employee non-solicitation covenant that prohibits the solicitation of Guy Carpenter employees both during Jameson's, Beard's, Durbin's, and Wilson's employment at Guy Carpenter and for a period of one year following the termination of their employment:

The Employee acknowledges and agrees that solely as a result of employment with the Company, and in light of the broad responsibilities of such employment which include working with other employees of the Company, the Employee has and will come into

contact with and acquire Confidential Information and trade secrets regarding the Company's other employees.  Accordingly, both during employment with the Company and for a period of twelve (12) months thereafter, the Employee shall not, either on the Employee's own account or on behalf of any person, company, corporation, or other entity, directly or through others, solicit, or endeavor to cause any employee of the Company with whom the Employee, during the last two (2) years of his or her employment with the Company, came into contact for the purpose of soliciting or servicing business or about whom the Employee obtained Confidential Information to leave employment with the Company.

Ex. J (RCA) § 3.

61.    Like the Agreements, the Restrictive Covenants Agreements also prohibit the use

or disclosure of confidential and trade secret information:

Restrictive Covenants: Confidentiality And Non-Disparagement

(a) The Employee agrees that he or she will not, during his or her employment with the Company, or at any time after such employment terminates, use for his or her own or another's purposes, or disclose to any other person or entity (other than in the proper course of employment with the Company) any Confidential Information.

Ex. J (RCA) § 4(a).

62.    In addition, the Restrictive Covenants Agreements require Defendants to return

Guy Carpenter property upon the termination of their employment:

Immediately upon the termination of employment with the Company for any reason, or any time the Company so requests, Employee will return to the Company:  (i) any originals and all copies of all files, notes, documents, slides (including transparencies), computer disks, printouts, reports, lists of the Company's clients or leads or referrals to prospective clients, and other media or property in the Employee's possession or control which contain or pertain to Confidential Information or trade secrets; and (ii) all property of the Company, including, but not limited to, supplies, keys, access devices, books, identification cards, computers, telephones and other equipment.  The Employee agrees that upon completion of the obligations set forth in this subparagraph, and if requested by the Company, Employee will execute a statement declaring that he or she has retained no property of the Company or materials containing Confidential Information nor has he or she supplied the same to any person, except as required to carry out his/her duties as an employee of the Company.  A receipt signed by an Officer of the Employer itemizing the returned property is necessary to demonstrate that Employee has returned all such property to the Company.

Ex. J (RCA) § 4(b).

63.     Jameson, Beard, Durbin, and Wilson were highly compensated through the restricted stock units they were awarded in exchange for their agreement to the terms of their respective Restrictive Covenants Agreements.

***The Agreements Are Enforceable and Necessary to Protect Guy Carpenter's Business Interests***

64.     In their Agreements, Defendants agreed that the restrictions in these agreements are "vital to protect [Guy Carpenter's] business interests," "reasonably drawn to this end," and "supported by adequate consideration":

> Employee acknowledges and agrees that the restrictions set forth in this Agreement are vital to protect the Company's legitimate business interests (including the protection of its Confidential Information and customer goodwill); are reasonably drawn to this end with respect to duration, scope, and otherwise; are not unduly burdensome; are not injurious to the public interest; and are supported by adequate consideration.

Exs. A–E (Jameson, Beard, Durbin, Wilson, Goeke NNCAs) § 7(c).

65.     Jameson, Beard, Durbin, and Wilson likewise agreed in the Restrictive Covenants Agreements that the restrictions in those agreements are "necessary to protect the legitimate business interests of the Company and are reasonable":

> 6. Employee's Acknowledgement
>
> Employee hereby expressly acknowledges and agrees that (a) the restrictions and obligations set forth in and imposed by Sections 2, 3, 4, and 5 will not prevent Employee from obtaining gainful employment in Employee's field of expertise or cause Employee undue hardship; and (b) the restrictions and obligations imposed on Employee under Sections 2, 3, 4 and 5 are necessary to protect the legitimate business interests of the Company and are reasonable in view of the benefits and consideration Employee has received or will receive from the Company from each Consideration Event.

Ex. J (RCA) § 6.

66.     The Agreements also make clear that, in the event that any Defendant violates any provision of the Agreements, it would result in "irreparable injury" to Guy Carpenter.  The Agreements provide:

In recognition of the fact that irreparable injury will result to the Company in the event of a breach of my obligations under this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefore, Employee acknowledges and consents and agrees that in the event of such breach, or the threat thereof, the Company shall be entitled, in addition to any other legal remedies and damages available, to specific performance of such obligations and to temporary and permanent injunctive relief to restrain the violation or threatened violation of such obligations by Employee and persons acting for or in connection with Employee. The Company and Employee agree that in the event the Company seeks injunctive relief based on a breach of this Agreement, bond in the amount of $1,000 shall be adequate security for such injunctive relief. The prevailing party shall be entitled to reasonable attorneys' fees and costs (including reasonable expert witness fees), in addition to any other relief granted, incurred in any legal action arising under this Agreement.

Exs. A–D (Jameson, Beard, Durbin, Wilson NNCAs) § 7(c); *see also* Ex. E (Goeke NNCA) § 7(c) (similar).

67.     The Restrictive Covenants Agreements include a similar provision:

7. Equitable Relief

In recognition of the fact that irreparable injury will result to the Company in the event of a breach by the Employee of his or her obligations under Section 2, 3, 4 or 5 of this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefor, the Employee acknowledges, consents, and agrees that in the event of such breach, or the threat thereof, the Company shall be entitled, in addition to any other legal remedies and damages available, to (a) specific performance thereof and to temporary and permanent injunctive relief (without the necessity of posting a bond) to restrain the violation or threatened violation of such obligations by the Employee and persons acting for or in connection with the Employee and (b) recovery of all reasonable sums and costs, including attorneys' fees, expert witness fees, expenses and costs incurred by the Company in seeking to enforce the provisions of this Agreement.

Ex. J (RCA) § 7.

68.     Although Defendants were at-will employees, the Agreements provide that Defendants could only terminate their employment upon providing Guy Carpenter 60 days' notice (the "notice period"). *See* Exs. A–E (Jameson, Beard, Durbin, Wilson, Goeke NNCAs) § 1(a). The Agreements make clear that during the notice period, Defendants "remain obligated to perform any or all of [their] regular job duties" and "remain an employee of the Company with all

attendant fiduciary duties, including, without limitation, his/her duties of loyalty and confidentiality to the Company."  Exs. A–E (Jameson, Beard, Durbin, Wilson, Goeke NNCAs) § 1(b).

**IV.   Defendants Participate in an Illicit Scheme to Raid GC Access and Steal Guy Carpenter's Confidential Information and Clients for the Benefit of Themselves and Guy Carpenter's Direct Competitor, Howden.**

69.    Howden competes with Guy Carpenter in the highly competitive reinsurance broker business.  Howden is based in the United Kingdom and has not historically had a presence in the United States—including no presence at all in the U.S. MGA market.  Rather than invest time and resources to establish such a presence of its own (as Guy Carpenter did) and compete fairly in the marketplace, Defendants and Howden hatched an unlawful scheme to simply take GC Access's employees, clients, and confidential information.

70.    Howden and its principals could not execute the plan to raid GC Access alone.  As detailed below, Howden and its principals enlisted the senior executives and key employees of the GC Access business, who had close relationships with GC Access's employees and clients, to advance their unlawful scheme and lay the groundwork for the raid of GC Access's employees and clients.

71.    Jameson started to plan this raid with Howden's Chair, Elliot Richardson, in September 2021.  While attending the annual Property Casualty Insurers Conference in the fall of 2021, Guy Carpenter's CEO of North America, John Trace, learned of rumors that Jameson and other employees were engaged in discussions with Howden.  When Trace confronted Jameson, he admitted that he had been approached by Howden but denied any interest in leaving Guy Carpenter to go to Howden.  But, unbeknownst to Guy Carpenter, Jameson was indeed in active negotiations with Howden and would make frequent trips to London in the following months to solidify the deal.

72.    Defendants reached an agreement with Howden in which they would join Howden as part of a package deal, bringing along as many top-performing GC Access employees as they could lure away.  Defendants utilized confidential personnel data of GC Access employees, including information about compensation, performance evaluations, and client contacts—and shared that information with Howden—in order to target recruits and design offers to entice them to leave Guy Carpenter.

73.    Defendants also worked with Howden to develop a carefully orchestrated plan to identify Guy Carpenter clients, particularly ones with which Defendants had strong relationships, to move their business from Guy Carpenter to Howden.  Identifying and making proposals to these clients necessarily involved the use of Guy Carpenter's confidential information, including information about the clients' current contracts with Guy Carpenter, Guy Carpenter's pricing, Guy Carpenter's business development strategies, and client reinsurance structures and preferences.

74.    Defendants began their efforts to poach other Guy Carpenter employees in January 2022, when they began to discuss the move with several of the other Departing Employees.  While these conversations largely took place by telephone, email, and text and/or WhatsApp message, Defendants did at times travel to meet with Howden representatives in London and New York. For example, in February 2022, Wilson, Goeke, and a number of the other Departing Employees traveled to New York together where these individuals met with employees of Howden.   On information and belief, Defendants worked with Howden to organize and encourage these trips to New York for the purpose of soliciting these Departing Employees to leave Guy Carpenter for Howden—and to take Guy Carpenter's clients with them.

75.    The Departing Employees actively attempted to destroy evidence that these trips involved meetings with Howden.  For example, Ferrari deleted communications with some of the

Defendants from his work-issued cell phone in an attempt to hide communications about the illicit raid.  Guy Carpenter was only able to recover these messages through a forensic examination of Ferrari's Guy Carpenter-issued mobile device, which showed evidence of recently deleted messages that Guy Carpenter was able to restore.

76.     The recovered messages show that while Goeke was on a trip to New York in February 2022, he communicated to Ferrari that his meetings with Howden "went great" and that they "answered every question" he had.  Ferrari responded to Goeke:  "I think we have to appreciate that there will always be an element of the unknown going into this but from what I understand they get that and *are willing to do whatever it takes to make it work*.  Nothing will be perfect day one but *all together we can make it work* the right way."  Ferrari deleted these messages in an attempt to conceal that he and Goeke were discussing the illicit raid and the plan to "make it work" if "all together" the Departing Employees conspired with Howden to execute the raid.

77.     Defendants ratcheted up their efforts to recruit GC Access employees in March and April 2022.  Defendants reached out to almost all of the members of the GC Access team in March and April 2022 to solicit them to join Howden with them.  Defendants also provided Howden with GC Access employees' personal contact information and other confidential personnel information so that Howden could further the solicitation by reaching out to the employees directly.  Howden executives used this information to initiate and engage in communications via email, telephone and text and/or WhatsApp messages with the Departing Employees.

78.     For example, Jameson made overtures to fellow GC Access colleagues via telephone and in person.  Jameson recruited current Guy Carpenter employees at an April 1, 2022 Dallas office happy hour.  He also recruited multiple employees at an April 2022 lunch with Arista

and another GC Access employee, during which he spoke to Arista directly about the potential financial opportunities involved with moving to Howden.  At another dinner, Jameson stayed late with a Guy Carpenter employee to tell him about the move and encourage the employee to "trust" him and "stick by" him.

79.     Jameson also recruited Guy Carpenter employees, including Matusiak, Skeeter, and Hardee by inviting them to his lake house, where, on information and belief, Jameson discussed the move to Howden and encouraged these employees to follow him.  Moreover, about a month prior to his departure, Jameson contacted a current Guy Carpenter employee to tell her about an opportunity to be a part of something "exciting" and "new," and he later told her that a "majority of us" are leaving.  Shortly after Jameson's first conversation, Howden's Chair, Elliot Richardson, contacted the same employee to discuss specifics about the coordinated move, including compensation.  Richardson told the employee that a "good portion" of the Dallas office would be moving to Howden.

80.     Similarly, Beard contacted another current Guy Carpenter employee to tell the employee that Richardson from Howden would be calling them to discuss a "good opportunity." Beard then told the employee that if they "like what [they] hear, then maybe [they] should join us."  Beard also mentioned that "a few of us are going."  A few hours later, as promised by Beard, Richardson called the employee to talk to them about defecting to Howden.  Howden's Head of HR Strategy and Transformation, Charlotte Hubble, later followed up with the same employee about the details of an employment offer.  Even the night before the raid, Beard was continuing to call Guy Carpenter employees, encouraging them to move to Howden and discussing the due diligence he had done on the move before the scheme got off the ground.

81.     Defendants also provided Howden's senior executives with confidential information about Guy Carpenter employees to use in recruiting these employees to leave Guy Carpenter and join Howden.  For example, in early April 2022, Richardson called multiple Guy Carpenter employees to recruit them to Howden.  Jameson and Beard had previously spoken to these employees in an attempt to convince them to leave Guy Carpenter for Howden, but the employees had conveyed a number of reasons for staying with Guy Carpenter.  Jameson and Beard shared these reasons and other details about the employees with Richardson and coached Richardson on the employees' concerns in an effort to help Richardson convince the employees to defect to Howden.  Jameson and Beard also told Richardson about the employees' primary clients in order to prepare Richardson to talk to the employees about how those clients could be moved to Howden.  On his calls with these employees, Richardson told the employees that the "whole team" was leaving for Howden and asked them "what would be left" for them if they stayed at Guy Carpenter.

82.     Defendants also provided Howden with detailed insight into the GC Access workforce and told Howden precisely who they should hire and how much they should be compensated.  Defendants identified the GC Access employees for Howden to contact and told Howden how to contact these employees—who had never previously been recruited or contacted by Howden.  Howden even made offers of employment to certain Departing Employees *without even conducting interviews*, because Defendants had already selected for Howden precisely who should receive offers and the terms of those offers.  The offers Howden made to these employees, despite having never interviewed or asked the employees for their compensation information, were based on detailed knowledge of the Departing Employees' salaries and bonuses at Guy

Carpenter—again because Defendants provided Howden with this confidential information about Guy Carpenter's employees.

83.     Defendants' targeted solicitation extended to all facets of the GC Access business. For example, on information and belief, Defendants worked together to solicit Matusiak to join the group raid.  Matusiak, an actuary rather than a broker, had specialized knowledge of GC Access's analytics and actuarial services, including the confidential and proprietary tools used for this work, like MetaRisk, described above.  Given his technical, supporting role, Matusiak was valuable to Defendants and to Howden only if their goal was to create a mirror-image of GC Access and the services provided by GC Access through the raid.  Accordingly, Defendants worked to ensure that Matusiak would be part of the package deal.  Notably, following the resignations, Matusiak claims to have forgotten the password to his work-issued mobile device. On information and belief, this "forgotten password" was another attempt by Matusiak and Defendants to conceal information about their illicit activity.

84.     Defendants' work on behalf of Howden—while still on the payroll of Guy Carpenter—was not limited to soliciting Guy Carpenter employees.  In February, March, and April 2022, while employed by Guy Carpenter, Defendants also solicited Guy Carpenter clients to move their business to Howden.

85.     For example, the day of the Departing Employees' resignations, a number of Guy Carpenter's MGA clients in the auto insurance industry were attending a conference at the Ritz Carlton hotel in Dana Point, California—the Auto Insurance Report National Conference.  After news of the raid of GC Access broke, the president of a Guy Carpenter client at the conference bragged that she had known about the departures "for weeks" because Durbin had been discussing

the departures with her and asking her to follow him to Howden.  The client told a number of people at the conference that she was already planning to move her business to Howden.

86.     Similarly, in March 2022, Durbin and Goeke traveled to London to meet both with Howden and current Guy Carpenter clients.  On information and belief, during this trip, Durbin met with a Guy Carpenter client and encouraged the client to cut ties with Guy Carpenter and move to Howden.  To add insult to injury, Durbin then sought reimbursement for the entire trip from Guy Carpenter, noting the client meeting.  About a month later, on the day before he resigned from Guy Carpenter, Durbin again traveled to London.  On information and belief, the purpose of this visit, once again, was to convince this client to move its business to Howden.  Shortly after the raid, Guy Carpenter received confirmation that this client was moving its business to Howden.

87.     Further, on information and belief, prior to submitting their resignations to Guy Carpenter, Defendants misappropriated Guy Carpenter confidential information and trade secrets and used this information to solicit current and potential Guy Carpenter employees and clients to move their business to Howden.

88.     For example, on March 6, 2022, Jameson accessed the cloud storage application DropBox on his work computer, where, on information and belief, Jameson exfiltrated confidential Guy Carpenter information to external cloud storage, where the confidential information could be utilized for Howden's benefit.

89.     Less than a week before the mass resignations, on information and belief, Durbin accessed, reviewed, and misappropriated highly confidential material saved in a GC Access server folder named "internal," including information about GC Access's client "Prospect Pipeline" and "MGA Pipeline"—documents detailing particular clients, programs, actual and expected revenue, and other sensitive information about current and prospective clients.  At the same time, Durbin

also accessed a number of files related to clients that have now moved their business from Guy Carpenter to Howden.  On information and belief, Durbin utilized this confidential information to solicit new business for Howden.

90.     Additionally, on April 20, 2022, Durbin attempted to forward confidential information to himself related to one of his accounts.  On information and belief, Durbin intended to use this confidential information to solicit new business for Howden, including soliciting new co-brokering agreements with parties that Durbin worked with while employed by Guy Carpenter.

91.     In addition, Beard reviewed a number of presentations just a few days prior to his April 25, 2022 resignation, including presentations titled "Startup Playbook—GC Access" and others related to "Growth Strategy."  And on April 20, 2022, just days before resigning, Beard requested access to confidential data detailing Guy Carpenter's valuation of Guy Carpenter's MGAs and brokers, including price and EBITDA.

## V.     Defendants Resign from Guy Carpenter Almost Simultaneously and Begin Working for Howden.

92.     On April 25, 2022, Defendants put their covert plan into motion and executed a series of coordinated actions designed to steal GC Access's employees and clients for Howden.

93.     On the morning of the raid, the eleven U.S.-based Departing Employees (including all of Defendants) gathered in a private room in a high-end local Dallas restaurant and hotel with Howden's senior executives.  Howden and Defendants held this meeting to ensure the other Departing Employees carried through with the plan and to prevent any last-minute changes of heart.  At this gathering, the Departing Employees coordinated to draft and send carefully crafted notices of resignation.

94.     Jameson initiated the resignations in the United States when he submitted his resignation to Guy Carpenter CEO John Trace at 7:32 AM Central Standard Time.  Shortly

thereafter, the remaining U.S. Departing Employees (Durbin, Beard, Wilson, Goeke, Hardee, Williams, Skeeter, Brock, Arista, and Matusiak) all submitted similar resignation emails within minutes of each other.  Each of these employees sent their resignations directly to Jameson—despite the fact that not all of these employees reported directly to him.  Ferrari, a Departing Employee from Guy Carpenter's London office, similarly resigned at 8:06 AM Central Standard Time.

95.     In total, the twelve Departing Employees all submitted their resignations within 34 minutes of one another on the morning of April 25, 2022.  Approximately one hour after receiving the resignation emails of the U.S. Departing Employees, Jameson forwarded each of them to Trace.  As the following chart details, the close timing of the resignations makes clear that the exodus of the Departing Employees was carefully coordinated:

| Name | Time of Resignation (CST) |
|---|---|
| Michael Jameson | 7:32 AM |
| Kenneth Durbin | 7:38 AM |
| Kyle Goeke | 7:42 AM |
| Andrew Hardee | 7:48 AM |
| Matthew Beard | 7:52 AM |
| Bennett Brock | 7:54 AM |
| James Matusiak | 7:57 AM |
| Barrett Skeeter | 7:57 AM |
| Zachary Wilson | 8:01 AM |
| Mayda Arista | 8:04 AM |
| Oliver Ferrari | 8:06 AM |

| Benjamin Williams | 8:06 AM |
|---|---|
| Caprice Terry[3] | 8:24 AM |

96.     Later that day, the Departing Employees had a dinner with Howden executives at a yet-to-be-opened Dallas restaurant, Au Troisième, in which Jameson is or was an investor, to celebrate their raid of Guy Carpenter.

97.     In the days following the resignations, Guy Carpenter attempted to investigate the facts surrounding the Departing Employees' mass resignations.  Guy Carpenter human resources personnel spoke with many of the Departing Employees after they resigned.   During these interviews, all of the Departing Employees admitted that they had accepted new positions at Howden.  When asked why they had selected to go to Howden, the Departing Employees offered the same generic and scripted response that they believed the experience at Howden would be "entrepreneurial."   It became clear to Guy Carpenter that the Departing Employees had been coached to all deliver the same canned responses.  For example, when some of the Departing Employees were asked to explain what an "entrepreneurial" opportunity meant to them, they could not do so.

98.     The Departing Employees obstructed Guy Carpenter's investigation of the facts surrounding their mass exodus and attempted to cover up their breaches of their contractual obligations and other legal duties—clearly demonstrating their consciousness of guilt.

99.     Two of the Departing Employees (Jameson and Brock) entirely failed to participate in any exit interviews with Guy Carpenter human resources and compliance personnel.   One

---

[3]  Caprice Terry initially resigned along with the Departing Employees, but ultimately chose to stay with Guy Carpenter.

Departing Employee (Matusiak) returned his Guy Carpenter mobile device to the Company but without the necessary password, which he claimed to have forgotten.

100.    Other Departing Employees who did participate in exit interviews gave answers that were evasive or that appear to have been untrue.  For example, Beard refused to discuss the timeline of events involving his decision to leave, including who approached him about joining Howden.  Durbin admitted to meeting with someone from Howden but refused to provide a name.  Durbin also claimed that he only discussed his potential departure from Guy Carpenter with his wife—even though he resigned at the same time and at the same location as eleven other GC Access employees, an act that was obviously coordinated with the other Departing Employees, and clients had been solicited by Durbin *weeks* before his resignation became public knowledge.  Arista also refused to answer questions on the basis that her attorney (who she admitted was provided to her by Howden) told her not to answer any questions related to Howden.  Williams refused to provide details about who contacted him about joining Howden.

101.    Further, some of the more junior Departing Employees claimed that they were contacted by Howden just days prior to their departure but that they did not know others were leaving to Howden.  This fabricated story made no sense.  Howden did not have an established U.S. presence, so junior employees would only have agreed to move *knowing* that the rest of the team (along with their book of business) would also be moving to Howden.  For this reason and others, it became clear to Guy Carpenter that the junior Departing Employees were part of a coordinated effort led by Howden and Defendants.

## VI.    Defendants Misappropriate Guy Carpenter Confidential Information and Unlawfully Induce Guy Carpenter's Clients to Move to Howden.

102.    After tendering their resignations, Defendants were subject to a contractual notice period to remain employees of Guy Carpenter for up to 60 days following their resignations.

103.     Defendants thus remained bound as continuing employees by their fiduciary duties and the various contractual covenants in their Agreements.  Jameson, Beard, Durbin, and Wilson were also bound by the additional covenants in their Restrictive Covenants Agreements.  Indeed, Guy Carpenter continued to pay the full salaries of Defendants during their notice period until their employment was terminated on May 24 and 26, 2022.

104.     Despite these obligations, while they remained employed by Guy Carpenter before their notice periods expired, Defendants were actually working on behalf of Howden—in other words, *while they were still employed by Guy Carpenter.*

105.     On information and belief, Defendants attended a conference hosted by Howden in Del Mar, California in May 2022 while they were still employed at Guy Carpenter.  As discussed above, Howden does not have a presence in the United States, and on information and belief, Guy Carpenter's employees marketed themselves as representatives of Howden during this conference. The sole purpose for doing so was to solicit new business opportunities for Howden, including in some instances from current or prospective clients of Guy Carpenter.

106.     Further, while still employed by Guy Carpenter, Defendants solicited Guy Carpenter clients to cut ties with Guy Carpenter and take their business to Howden.

107.     For example, on the day of the mass resignations, the CEO of a Guy Carpenter client sent an email to Goeke, which explained that he had heard a "rumor" that Jameson and "some team" resigned from Guy Carpenter and asked Goeke whether the rumor was true.  Goeke responded that he would call the CEO.  On information and belief, Goeke called the CEO and solicited him to move his business from Guy Carpenter to Howden.

108.     Further, *the day after* the Departing Employees submitted their resignation notices to Guy Carpenter, one of Guy Carpenter's clients provided written notice that it was taking its

business to Howden.  In a letter dated April 26, 2022, this client stated that, as of the date of the letter, it had appointed Howden as its Broker of Record following the expiration of its current contract with Guy Carpenter.  Jameson and other Defendants were heavily involved in this account at Guy Carpenter.

109.    The timing of this client's move to Howden is no coincidence.  Given that this client moved its business to Howden just one day after Defendants' resignations—when the news of the resignations had barely begun to circulate in the trade press and on the market—one or more of the Defendants had clearly informed the client prior to their April 25, 2022 resignations of the fact and timing of the team's plan to leave Guy Carpenter for Howden and had solicited this client to move its business to Howden.

110.    Since then, a number of clients with dozens of specific programs have moved their business from Guy Carpenter to Howden, resulting in millions of dollars in lost revenue to Guy Carpenter.  The first moved the day after the raid, some moved during Defendants' notice period, and others have moved following Defendants' termination from Guy Carpenter.  Each of these clients was serviced by some or all of the Defendants while they were employed at Guy Carpenter, and each of the Defendants were privy to confidential information about these clients.

111.    Once it became clear that Defendants had violated their fiduciary duties and the Agreements (and the Restrictive Covenants Agreements) and were continuing to do so by actively working to induce Guy Carpenter's clients to leave the Company for Howden, Guy Carpenter took action to contain the harm that Defendants were inflicting on Guy Carpenter.  Between May 24 and 26, 2022, Guy Carpenter elected to end Defendants' notice periods and terminated their employment.  Specifically, the Company terminated Jameson's employment on May 24, 2022, and terminated Durbin's, Beard's, Wilson's, and Goeke's employment on May 26, 2022.

112.    Shortly thereafter, all of these individuals formally announced they had assumed substantially similar roles at Howden.   Defendants are using Guy Carpenter confidential information in connection with their new employment at Howden and for the benefit of Howden.

113.    Indeed, after Defendants left Guy Carpenter, it has become clear that a number of key confidential, trade secret files are "missing."   Such files include Interests and Liabilities Agreements, which set forth the percentage of the risk that each reinsurer has agreed to assume under a given reinsurance policy.

114.    Defendants left behind digital fingerprints of their misconduct.   For example, on April 24, 2022, the day before the mass resignations, Wilson received an automated email from Microsoft with the subject line "Heads up!   We noticed that you recently deleted a large number of files from your One Drive."   On information and belief, Wilson deleted a significant number of files from his Guy Carpenter One Drive account, including confidential and trade secret files, on the eve of his resignation in a (failed) attempt to cover up his breaches of his contractual obligations and fiduciary duties.

## VII.    Defendants Continue to Unlawfully Solicit Guy Carpenter Employees and Clients Following Their Termination.

115.    Although Defendants are no longer employed by Guy Carpenter, Defendants still remain bound by the non-solicitation covenants in their Agreements and the Restrictive Covenants Agreements for one year following their termination.   Exs. A–E (Jameson, Beard, Durbin, Wilson, Goeke NNCAs) § 2; Ex. J (RCA) §§ 2–3.   Defendants have brazenly violated their ongoing contractual obligations.

116.    Defendants' efforts to unlawfully solicit Guy Carpenter's employees did not end on April 25, 2022, or even after their terminations in May 2022.   Indeed, Defendants *continue to this day* to solicit Guy Carpenter's employees to join Howden, despite unequivocal post-

termination obligations prohibiting such actions.

117.   As an example, on the evening of June 9, 2022—following the announcement of a large Howden acquisition in the United States—a number of the Departing Employees gathered to celebrate together.  During this celebration, Jameson called a current Guy Carpenter employee, told him he should move to Howden, and asked him why he was still staying at Guy Carpenter.

118.   Defendants have also continued to solicit Guy Carpenter clients.  Since terminating Defendants' employment, Guy Carpenter has learned that multiple clients are moving their business to Howden as a result of the unlawful solicitation by Defendants—including at least one client that Jameson, Beard, Durbin, and Wilson began to solicit well before they resigned from Guy Carpenter.

119.   For example, one client that left Guy Carpenter sent a letter on June 30, 2022 informing Guy Carpenter that it was moving its business to Howden.  Beard was the primary client contact for this account, but it was also serviced by other Defendants, including Durbin.  On April 21, 2022, four days before the coordinated resignations, Beard received an email from the president of this client, which asked if Beard was attending the "Boston conference" and stated "let's try to find some way to connect.  Drinks &/or Dinner would work for us on Monday."  While it appears that Beard did not respond to the client through his Guy Carpenter email address, on information and belief, Beard responded to this client through other means and began to solicit this client to move its business to Howden.  Then, shortly after the Defendants' termination, this client sent a letter to Durbin—then a Howden employee—stating that indeed the client was moving its business to Howden.

120.   As of the date of this filing, Guy Carpenter is aware that Defendants are actively communicating with multiple Guy Carpenter clients that they serviced in an attempt to move their

business to Howden.  For example, Jameson, Beard, and Goeke set up a meeting with one of these Guy Carpenter clients to discuss new business opportunities, and Beard is currently in active communications—and even having in-person meetings—with another Guy Carpenter client discussing whether they will bring their business to Howden.

121.    Further, in encouraging Guy Carpenter clients to take their business to Howden, Defendants have told these clients that they will still be able to service their accounts at Howden and not to worry about contractual restrictions on their ability to service these customers' accounts—thus confirming Defendants' blatant disregard for their ongoing contractual obligations, which expressly prohibit Defendants from "solicit[ing] or accept[ing] business of the type offered by the Company" from "clients or prospects of the Company" for one year after their termination.  Exs. A–E (Jameson, Beard, Durbin, Wilson, Goeke NNCAs) § 2.

122.    Defendants—apparently anticipating that there would be legal action following the illicit raid—have also told clients that there would ultimately be a "settlement" between Guy Carpenter and Howden, and that as part of that settlement, Defendants would be permitted to legally continue servicing the former Guy Carpenter client accounts (in contrast to the *illegal* servicing that is currently taking place).

123.    The harm that Defendants have inflicted on Guy Carpenter is substantial and worsening by the day.  Since Defendants put their plan to raid Guy Carpenter into motion, over half of the GC Access employees have moved to Howden and numerous GC Access clients with dozens of programs—which collectively generate millions of dollars in revenue annually—have left GC Access, undermining and misappropriating the value of Guy Carpenter's significant investments in building relationships with its clients.  These clients have severed their relationships with GC Access, destroying Guy Carpenter's massive investments in building relationships with

its clients and immeasurably harming Guy Carpenter's reputation and goodwill in the industry.

## COUNT I
### Breach of Contract—Non-Solicitation of Employees
### (*As Against All Defendants*)

124.    Guy Carpenter repeats and re-alleges Paragraphs 1 through 123 of this Complaint as if fully set forth herein.

125.    Defendants agreed to the Agreements and received consideration for them in the form of continued employment and access to confidential information belonging to Guy Carpenter. The Agreements were also ancillary to Defendants' employment agreements with Guy Carpenter and made at the same time as those agreements.   The Agreements remain valid and fully enforceable contracts.

126.    Guy Carpenter has performed all of its obligations under the Agreements.

127.    The Agreements contain valid, enforceable, and binding non-solicitation covenants, which serve to protect Guy Carpenter's legitimate business interests.   The Agreements include reasonable limitations on time, geographic area, and scope of activity.   Defendants and Guy Carpenter agreed that the Agreements' restrictions on Defendants are "vital to protect the Company's legitimate business interests" and are "reasonably drawn to this end with respect to duration, scope, and otherwise."   Exs. A–E (Jameson, Beard, Durbin, Wilson, Goeke NNCAs) § 7(c).

128.    In particular, as a condition of their employment with Guy Carpenter, and in exchange for valuable consideration thereunder, Defendants agreed to be bound by employee non-solicitation covenants that required Defendants to refrain from soliciting employees of Guy Carpenter to terminate their employment with the Company for a period of one year following the termination of their employment at Guy Carpenter.

129.    Jameson, Beard, Durbin, and Wilson agreed not to "solicit, induce, or encourage, or assist others in soliciting, inducing, or encouraging, any employee of the Company or its affiliates to terminate his or her employment with the Company or such affiliate, as applicable, for any reason." Exs. A–D (Jameson, Beard, Durbin, Wilson NNCAs) § 2.

130.    Goeke agreed not to "solicit, induce, or encourage, or assist others in soliciting, inducing, or encouraging, any employee of the Company with whom Employee, during the last two (2) years prior to separation from employment with the Company, came into contact for the purpose of soliciting or servicing business or about whom Employee obtained Confidential Information and Trade Secrets to terminate his or her employment with the Company for any reason." Ex. E (Goeke NNCA) § 2.

131.    Defendants agreed to remain bound by these employee non-solicitation covenants for a period of one year following the termination of their employment at Guy Carpenter. Exs. A–E (Jameson, Beard, Durbin, Wilson, Goeke NNCAs) § 2.

132.    Defendants breached these employee non-solicitation covenants by directly and/or indirectly soliciting Guy Carpenter employees, including employees with whom Defendants came into contact in the last two years of their employment at Guy Carpenter for the purpose of soliciting or servicing business and/or about whom Defendants had obtained confidential information and/or trade secrets, to terminate their employment at Guy Carpenter and to work for Howden.

133.    As a direct and proximate result of Defendants' breaches of the employee non-solicitation covenants to which they are bound, Guy Carpenter has suffered and will continue to suffer damages, including, but not limited to, the loss of employees in which Guy Carpenter had invested considerable resources to train and develop, loss of goodwill, harm to its reputation, and harm to customer relationships and customer prospects.

134.    Guy Carpenter is also being irreparably harmed by Defendants' breaches of the employee non-solicitation covenants to which they are bound and is therefore entitled to preliminary and permanent injunctive relief.

## COUNT II
### Breach of Contract—Non-Solicitation of Clients
**(As Against All Defendants)**

135.    Guy Carpenter repeats and re-alleges Paragraphs 1 through 134 of this Complaint as if fully set forth herein.

136.    Defendants agreed to the Agreements and received consideration for them in the form of continued employment and access to confidential information belonging to Guy Carpenter. The Agreements were also ancillary to Defendants' employment agreements with Guy Carpenter and made at the same time as those agreements.   The Agreements remain valid and fully enforceable contracts.

137.    Guy Carpenter has performed all of its obligations under the Agreements.

138.    The Agreements contain valid, enforceable, and binding non-solicitation covenants, which serve to protect Guy Carpenter's legitimate business interests.  The Agreements include reasonable limitations on time, geographic area, and scope of activity.  Defendants and Guy Carpenter agreed that the Agreements' restrictions on Defendants are "vital to protect the Company's legitimate business interests" and are "reasonably drawn to this end with respect to duration, scope, and otherwise."  Exs. A–E (Jameson, Beard, Durbin, Wilson, Goeke NNCAs) § 7(c).

139.    In particular, as a condition of their employment with Guy Carpenter, and in exchange for valuable consideration thereunder, Defendants agreed to be bound by client non-solicitation covenants that required Defendants to refrain from soliciting clients or prospective

clients of Guy Carpenter for a period of one year following the termination of their employment at Guy Carpenter.

140.    Jameson, Beard, Durbin, and Wilson agreed not to "solicit or accept business of the type offered by the Company during his/her term of employment with the Company, or perform, participate in, or supervise the performance of any services related to such type of business, from or for (i) clients or prospects of the Company or its affiliates who were solicited or serviced directly by Employee or where s/he supervised or participated in, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such clients or prospects within two (2) years prior to his/her termination of employment; or (ii) any former client of the Company or its affiliates who was a client within two (2) years prior to [Employee's] termination and who was solicited or serviced directly by Employee or where Employee supervised or participated in, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such former clients." Exs. A–D (Jameson, Beard, Durbin, Wilson NNCAs) § 2.

141.    Goeke agreed not to "solicit or accept business of the type offered by the Company during his or her employment with the Company, or perform, participate in, or supervise the performance or provision of any services related to such type of business, from or for (a) clients or prospects of the Company who were solicited or serviced directly by Employee or where he or she supervised or participated in, directly or through others, in whole or in part, the solicitation or servicing activities related to such clients or prospects; or (b) any former client of the Company who was solicited or serviced directly by Employee or where Employee supervised or participated in, directly or through others, in whole or in part, the solicitation or servicing activities related to such former clients." Ex. E (Goeke NNCA) § 2.  These restrictions apply to clients, former clients, or prospective clients "with whom Employee had contact or about whom Employee obtained

Confidential Information and Trade Secrets during the two (2) years prior to separation from employment with the Company." *Id.*

142.    Defendants agreed to remain bound by these client non-solicitation covenants for a period of one year following the termination of their employment at Guy Carpenter.  Exs. A–E (Jameson, Beard, Durbin, Wilson, Goeke NNCAs) § 2.

143.    Defendants breached these client non-solicitation covenants by directly and/or indirectly soliciting Guy Carpenter clients and prospective clients, including clients and prospective clients with whom Defendants had contact and/or about whom Defendants obtained confidential information and/or trade secrets during the last two years of their employment with Guy Carpenter.

144.    As a direct and proximate result of Defendants' breaches of the client non-solicitation covenants to which they are bound, Guy Carpenter has suffered damages, including, but not limited to, damages from lost revenue, lost business opportunities, loss of goodwill, harm to its reputation, and harm to customer relationships and customer prospects.

145.    Guy Carpenter is also being irreparably harmed by Defendants' breaches of the client non-solicitation covenants to which they are bound and is therefore entitled to preliminary and permanent injunctive relief.

## COUNT III
## Breach of Contract—Non-Disclosure of Confidential Information and Return of Property
### (*As Against All Defendants*)

146.    Guy Carpenter repeats and re-alleges Paragraphs 1 through 145 of this Complaint as if fully set forth herein.

147.    Defendants agreed to the Agreements and received consideration for them in the form of continued employment and access to confidential information belonging to Guy Carpenter.

The Agreements were also ancillary to Defendants' employment agreements with Guy Carpenter and made at the same time as those agreements.  The Agreements remain valid and fully enforceable contracts.

148.    Guy Carpenter has performed all of its obligations under the Agreements.

149.    The Agreements contain valid, enforceable, and binding non-disclosure covenants, which serve to protect Guy Carpenter's legitimate business interests and which are reasonable in time, geographic area, and scope.  These Agreements also contain valid, enforceable, and binding provisions requiring Defendants to return Guy Carpenter property upon the termination of their employment.  Defendants and Guy Carpenter agreed that the Agreements' restrictions on Defendants are "vital to protect the Company's legitimate business interests" and are "reasonably drawn to this end with respect to duration, scope, and otherwise."  Exs. A–D (Jameson, Beard, Durbin, Wilson, Goeke NNCAs) § 7(c).

### *Non-Disclosure of Confidential Information*

150.    As a condition of their employment with Guy Carpenter, and in exchange for valuable consideration thereunder, Defendants agreed to be bound by a substantially similar non-disclosure covenant that obligated them during the course of their employment with Guy Carpenter to refrain from "directly or indirectly, for any purpose whatsoever us[ing], or disclos[ing] to any person, Confidential Information, except to the extent required to carry out his/her duties as an employee of the Company."  Exs. A–D (Jameson, Beard, Durbin, Wilson NNCAs) § 3; *see also* Ex. E (Goeke NNCA) § 3 (similar).  This non-disclosure covenant further required these Defendants to refrain from "directly or indirectly, for any purpose whatsoever us[ing], or disclos[ing] to any person, Confidential Information" after "termination of his/her employment by the Company."  Exs. A–D (Jameson, Beard, Durbin, Wilson NNCAs) § 3; *see also* Ex. E (Goeke

NNCA) § 3 (similar).

151.    These agreements define "Confidential Information" as "any and all information in whatever form relating to the Company or any client or prospective client of the Company," Exs. A–D (Jameson, Beard, Durbin, Wilson NNCAs) § 3, or "items of information relating to the Company, its products, services, clients, suppliers, vendors, business partners, and employees that are not generally known or available to the general public, but have been developed, compiled or acquired by the Company at its or their great effort and expense," Ex. E (Goeke NNCA) § 3.

152.    Defendants breached this non-disclosure covenant by disclosing Guy Carpenter confidential information to Howden and/or using Guy Carpenter confidential information for the benefit of Howden without Guy Carpenter's consent.   Specifically, Defendants provided Guy Carpenter confidential information—including knowledge of prospective clients and current client contractual terms and pricing—to Howden without the consent of Guy Carpenter and used Guy Carpenter confidential information in order to contact current or potential Guy Carpenter clients to solicit their business for Howden.   In addition, Defendants provided confidential personnel data of GC Access employees, including compensation, performance evaluations, and client contacts, to Howden, without the consent of Guy Carpenter, to enable Howden to identify and recruit GC Access employees and used such confidential personnel data to solicit GC Access employees to leave Guy Carpenter for Howden.

153.    As a direct and proximate result of Defendants' breaches of the non-disclosure covenants to which they are bound, Guy Carpenter has suffered damages, including, but not limited to, the loss of employees in which Guy Carpenter had invested considerable resources to train and develop, damages from lost revenue, lost business opportunities, and harm to customer relationships and customer prospects.

154.    Guy Carpenter is also being irreparably harmed by Defendants' breaches of the employee non-solicitation covenants to which they are bound and is therefore entitled to preliminary and permanent injunctive relief.

### *Return of Property*

155.    As a condition of their employment with Guy Carpenter, and in exchange for valuable consideration thereunder, Defendants agreed to, "[i]mmediately upon the termination of employment with the Company," return to Guy Carpenter "any originals and all copies" of any documents or property "which contain or pertain to Confidential Information" and all other property of the Company.  Exs. A–D (Jameson, Beard, Durbin, Wilson NNCAs) § 4; *see also* Ex. E (Goeke NNCA) § 4 (similar).

156.    Defendants breached the return of property provision of the Agreements by failing to return all Guy Carpenter confidential information immediately upon the termination of their employment with Guy Carpenter.

157.    As a direct and proximate result of Defendants' breaches of the return of property provisions to which they are bound, Guy Carpenter has suffered damages, including, but not limited to, damages from lost revenue, lost business opportunities, loss of goodwill, harm to its reputation, and harm to customer relationships and customer prospects.

158.    Guy Carpenter is also being irreparably harmed by Defendants' breaches of the return of property provisions to which they are bound and is therefore entitled to preliminary and permanent injunctive relief.

**COUNT IV**
**Breach of Contract—Restrictive Covenants Agreement**
**(*As Against Jameson, Beard, Durbin, Wilson*)**

159.    Guy Carpenter repeats and re-alleges Paragraphs 1 through 158 of this Complaint

as if fully set forth herein.

160.    Jameson, Beard, Durbin, and Wilson agreed to the Restrictive Covenants Agreements and received substantial consideration for these agreements in the form of restricted stock units and access to confidential information belonging to Guy Carpenter.  The Restrictive Covenants Agreements remain valid and fully enforceable contracts.  Ex. J (RCA); *see* Exs. F–I (2021 Restricted Stock Unit Agreement for Jameson, Beard, Durbin, Wilson).

161.    Guy Carpenter has performed all of its obligations under the Restrictive Covenants Agreements.

162.    The Restrictive Covenants Agreements contain valid, enforceable, and binding non-solicitation and non-disclosure covenants, which serve to protect Guy Carpenter's legitimate business interests.  The Restrictive Covenants Agreements include reasonable limitations on time, geographic area, and scope of activity, and their restrictions on Jameson, Beard, Durbin, and Wilson impose no greater restraint than is reasonably necessary to protect Guy Carpenter's legitimate business interests.  These Defendants and Guy Carpenter agreed that the Restrictive Covenants Agreements' restrictions are "necessary to protect the legitimate business interests of the Company" and are "reasonable."  Ex. J (RCA) § 6.

### *Non-Solicitation of Guy Carpenter Clients*

163.    As a condition of accepting restricted stock units from Guy Carpenter, and in exchange for valuable consideration thereunder, Jameson, Beard, Durbin, and Wilson agreed to be bound by the Restrictive Covenants Agreements and client non-solicitation covenants that require them to refrain from soliciting any clients or prospective clients of Guy Carpenter for a period of twelve months following the termination of their employment at Guy Carpenter.

164.    In particular, Jameson, Beard, Durbin, and Wilson agreed not to "(i) solicit clients

of the Company for the purpose of selling or providing products or services of the type sold or provided by the Employee while employed by the Company; or (ii) induce clients or prospective clients of the Company to terminate, cancel, not renew, or not place business with the Company; or (iii) perform or supervise the performance of services or provision of products of the type sold or provided by the Employee while he or she was employed by the Company on behalf of any clients or prospective clients of the Company." Ex. J (RCA) § 2.  These restrictions apply to those clients or prospective clients of Guy Carpenter with which Jameson, Beard, Durbin, and Wilson had contact or about which they obtained confidential information or trade secrets during the last two years of their employment with Guy Carpenter.

165.    Jameson, Beard, Durbin, and Wilson agreed to remain bound by these client non-solicitation covenants for a period of twelve months following the termination of their employment at Guy Carpenter.  Ex. J (RCA) § 2.

166.    Jameson, Beard, Durbin, and Wilson breached these client non-solicitation covenants by directly and/or indirectly soliciting Guy Carpenter clients and prospective clients, including clients and prospective clients with whom they had contact and/or about whom they obtained confidential information and/or trade secrets during the last two years of their employment with Guy Carpenter.

167.    As a direct and proximate result of Jameson's, Beard's, Durbin's, and Wilson's breaches of the client non-solicitation covenants to which they are bound, Guy Carpenter has suffered damages, including, but not limited to, damages from lost revenue, lost business opportunities, loss of goodwill, harm to its reputation, and harm to customer relationships and customer prospects.

168.    Guy Carpenter is also entitled to liquidated damages for Jameson's, Beard's,

Durbin's, and Wilson's breaches of the client non-solicitation covenants in the Restricted Covenants Agreements.  *See* Ex. J (RCA) § 8.

169.     Guy Carpenter is also being irreparably harmed by Jameson's, Beard's, Durbin's, and Wilson's breaches of the client non-solicitation covenants to which they are bound and is therefore entitled to preliminary and permanent injunctive relief.

### *Non-Solicitation of Guy Carpenter Employees*

170.     As a condition of accepting restricted stock units from Guy Carpenter, and in exchange for valuable consideration thereunder, Jameson, Beard, Durbin, and Wilson agreed to be bound by the Restrictive Covenants Agreements and employee non-solicitation covenants that require them to refrain from soliciting any employee of Guy Carpenter to terminate his or her employment with the Company both during and after their employment.

171.     In particular, Jameson, Beard, Durbin, and Wilson agreed not to "solicit, or endeavor to cause any employee of the Company with whom the Employee, during the last two (2) years of his or her employment with the Company, came into contact for the purpose of soliciting or servicing business or about whom the Employee obtained Confidential Information to leave employment with the Company."  Ex. J (RCA) § 3.

172.     Jameson, Beard, Durbin, and Wilson agreed to remain bound by these employee non-solicitation covenants "both during employment with the Company and for a period of twelve (12) months" following the termination of their employment at Guy Carpenter.  Ex. J (RCA) § 3.

173.     Jameson, Beard, Durbin, and Wilson breached these employee non-solicitation covenants by directly and/or indirectly soliciting Guy Carpenter employees, including employees with whom they came into contact in the last two years of their employment at Guy Carpenter for the purpose of soliciting or servicing business and/or about whom they had obtained confidential

information and/or trade secrets, to terminate their employment at Guy Carpenter and to work for Howden.  Jameson, Beard, Durbin, and Wilson engaged in such solicitation both during their employment at Guy Carpenter and within twelve months following the termination of their employment.

174.    As a direct and proximate result of Jameson's, Beard's, Durbin's, and Wilson's breaches of the employee non-solicitation covenants to which they are bound, Guy Carpenter has suffered damages, including, but not limited to, the loss of employees in which Guy Carpenter had invested considerable resources to train and develop, loss of goodwill, harm to its reputation, and harm to customer relationships and customer prospects.

175.    Guy Carpenter is also being irreparably harmed by Jameson's, Beard's, Durbin's, and Wilson's breaches of the employee non-solicitation covenants to which they are bound and is therefore entitled to preliminary and permanent injunctive relief.

### *Non-Disclosure of Confidential Information*

176.    As a condition of accepting restricted stock units from Guy Carpenter, and in exchange for valuable consideration thereunder, Jameson, Beard, Durbin, and Wilson agreed to be bound by non-disclosure covenants that obligated them during the course of their employment with Guy Carpenter and after such employment not to "use for his or her own or another's purposes, or disclose to any other person or entity (other than in the proper course of employment with the Company) any Confidential Information."  Ex. J (RCA) § 4.

177.    The Restrictive Covenants Agreements define Confidential Information to include "personnel information, such as the identity and number of the Company's other employees and officers, their salaries, bonuses, benefits, skills, qualifications and abilities" and "any and all information in whatever form relating to any client or prospective client of the Company."  Ex. J

(RCA) § 4(a).

178.    Jameson, Beard, Durbin, and Wilson breached these non-disclosure covenants by disclosing Guy Carpenter confidential information to Howden and/or using Guy Carpenter confidential information for the benefit of Howden without Guy Carpenter's consent.  Specifically, Jameson, Beard, Durbin, and Wilson provided Guy Carpenter confidential information—including knowledge of prospective clients and current client contractual terms and pricing—to Howden without the consent of Guy Carpenter and used Guy Carpenter confidential information in order to contact current or potential Guy Carpenter clients to solicit their business for Howden.  In addition, Defendants provided confidential personnel data of GC Access employees, including compensation, performance evaluations, and client contacts, to Howden, without the consent of Guy Carpenter, to enable Howden to identify and recruit GC Access employees and used such confidential personnel data to solicit GC Access employees to leave Guy Carpenter for Howden.

179.    As a direct and proximate result of Jameson's, Beard's, Durbin's, and Wilson's breaches of the non-disclosure covenants to which they are bound, Guy Carpenter has suffered damages, including, but not limited to, the loss of employees in which Guy Carpenter had invested considerable resources to train and develop, damages from lost revenue, lost business opportunities, and irreparable harm to customer relationships and customer prospects.

180.    Guy Carpenter is also being irreparably harmed by Jameson's, Beard's, Durbin's, and Wilson's breaches of the non-disclosure covenant to which they are bound and is therefore entitled to preliminary and permanent injunctive relief.

### ***Return of Property***

181.    As a condition of accepting restricted stock units from Guy Carpenter, and in exchange for valuable consideration thereunder, Jameson, Beard, Durbin, and Wilson agreed to,

"[i]mmediately upon the termination of employment with the Company," return to Guy Carpenter "any originals and all copies" of any documents or property "which contain or pertain to Confidential Information or trade secrets" and all other property of the Company.  Ex. J (RCA) § 4(b).

182.     Jameson, Beard, Durbin, and Wilson breached the Restrictive Covenants Agreements by failing to return all Guy Carpenter confidential information immediately upon the termination of their employment with Guy Carpenter.

183.     As a direct and proximate result of Jameson's, Beard's, Durbin's, and Wilson's breaches of the return of property provision to which they are bound, Guy Carpenter has suffered damages, including, but not limited to, damages from lost revenue, lost business opportunities, loss of goodwill, harm to its reputation, and harm to customer relationships and customer prospects.

184.     Guy Carpenter is also being irreparably harmed by Jameson's, Beard's, Durbin's, and Wilson's breaches of the return of property provision to which they are bound and is therefore entitled to preliminary and permanent injunctive relief.

**COUNT V**
**Breach of Fiduciary Duty**
**(*As Against All Defendants*)**

185.     Guy Carpenter repeats and re-alleges Paragraphs 1 through 184 of this Complaint as if fully set forth herein.

186.     By virtue of their employment and privileged access to Guy Carpenter trade secrets and other confidential and proprietary information, Defendants owed fiduciary duties to Guy Carpenter, including, *inter alia*, duties of loyalty, absolute candor, good faith, and to avoid self-dealing and conflicts of interest.

187.    Defendants' fiduciary duties included, among other things, maintaining the confidentiality of Guy Carpenter's confidential information, acting in good faith while carrying out their responsibilities, and acting primarily for the benefit of Guy Carpenter in matters connected with their employment.

188.    While employed by Guy Carpenter, Defendants owed a fiduciary duty to Guy Carpenter to not solicit Guy Carpenter's clients away from Guy Carpenter or misappropriate Guy Carpenter's business opportunities for the benefit of themselves or competitors.  Defendants—while still employed by Guy Carpenter—breached their fiduciary duties to Guy Carpenter by soliciting clients to leave Guy Carpenter and to move their business to Howden.

189.    Further, to the extent there was no overlapping contractual obligation, Defendants, while employed by Guy Carpenter, owed a fiduciary duty to Guy Carpenter to not solicit Guy Carpenter's employees away from Guy Carpenter for the benefit of themselves or competitors. Defendants—while still employed by Guy Carpenter—breached their fiduciary duties to Guy Carpenter by soliciting Guy Carpenter's employees to leave employment with Guy Carpenter and accept employment with Howden.

190.    As a direct and proximate result of Defendants' breaches of fiduciary duties, Guy Carpenter has suffered damages, including the loss of employees in whom Guy Carpenter had invested considerable resources to train and develop, lost revenue, lost business opportunities, loss of goodwill, and harm to customer relationships and customer prospects.  Moreover, Defendants' misconduct was willful, wanton, and outrageous, and therefore entitles Guy Carpenter to punitive damages.

## COUNT VI
## Faithless Servant Doctrine
### (As Against All Defendants)

191.    Guy Carpenter repeats and re-alleges Paragraphs 1 through 190 of this Complaint as if fully set forth herein.

192.    By virtue of their employment and privileged access to Guy Carpenter trade secrets and other confidential and proprietary information, Defendants owed common law duties of loyalty, absolute candor, and good faith to Guy Carpenter.

193.    Defendants' duty of loyalty included, among other things, maintaining the confidentiality of Guy Carpenter's confidential information, acting in good faith while carrying out their responsibilities, and acting primarily for the benefit of Guy Carpenter in matters connected with their employment.

194.    While employed by Guy Carpenter, Defendants owed a duty to Guy Carpenter to not solicit Guy Carpenter's customers away from Guy Carpenter or misappropriate Guy Carpenter's business opportunities for the benefit of themselves or competitors.  Defendants— while still employed by Guy Carpenter—breached their duties of loyalty to Guy Carpenter by soliciting customers to leave Guy Carpenter and to move their business to Howden.

195.    Further, to the extent there was no overlapping contractual obligation, Defendants, while employed by Guy Carpenter, owed a duty to Guy Carpenter to not solicit Guy Carpenter's employees away from Guy Carpenter for the benefit of themselves or competitors.  Defendants— while still employed by Guy Carpenter—breached their duties of loyalty to Guy Carpenter by soliciting Guy Carpenter's employees to leave employment with Guy Carpenter and accept employment with Howden.

196.    Defendants' breaches of their duties of loyalty were not a single, isolated act, but

were repeated during the period of time in which they contemplated and ultimately decided to end their employment at Guy Carpenter and to commence employment at a competitor. As a result, each Defendant was a faithless servant toward Guy Carpenter.

197.    Defendants' conduct exhibits dishonesty and disloyalty to Guy Carpenter related to their employment at Guy Carpenter. As employees of Guy Carpenter, Guy Carpenter entrusted Defendants with its relationships with its employees and clients, and Defendants owed Guy Carpenter a duty to safeguard those relationships from competitors.

198.    Each Defendant received compensation, payment, distributions, and/or remuneration for their services to Guy Carpenter. As a result of Defendants' disloyal and faithless service, Defendants forfeited their right to any compensation received or to be received from Guy Carpenter, from the earliest date of their disloyalty. Defendants must disgorge their ill-gotten gains and forfeit all compensation, payments, distributions, commissions, or other remuneration received from Guy Carpenter subsequent to each Defendant's first disloyal act. Moreover, Defendants' misconduct was willful, wanton, and outrageous, and therefore entitles Guy Carpenter to punitive damages.

### COUNT VII
### Misappropriation of Trade Secrets and Confidential Information under New York Common Law
### (*As Against All Defendants*)

199.    Guy Carpenter repeats and re-alleges Paragraphs 1 through 198 of this Complaint as if fully set forth herein.

200.    Guy Carpenter possesses certain trade secrets and confidential information with which Defendants are familiar, and Defendants have a common-law duty not to use or disclose that information other than in the furtherance of Guy Carpenter's interests. These trade secrets and confidential information include, but are not limited to, information about clients, prospective

clients, growth opportunities, competitive pricing, terms and conditions of customer contracts, and proprietary information about GC Access's workforce (*i.e.*, information about employees' relative strengths and potential, various areas of expertise, and relationships with current or potential clients).    These trade secrets and confidential information were provided to Defendants in confidence.

201.    These trade secrets and confidential information are not generally known or readily ascertainable outside of Guy Carpenter.  To the extent any subset of information incorporated into these trade secrets and confidential information were publicly available, the compilation of the information is not.

202.    Guy Carpenter has spent substantial time and resources developing its trade secrets and confidential information.  Guy Carpenter has also undertaken reasonable efforts to guard the secrecy and confidentiality of the trade secrets and confidential information which Defendants possess and have used and/or disclosed, including, but not limited to, by (1) requiring that the Departing Employees sign confidentiality and non-disclosure agreements covering such trade secrets and confidential information; (2) requiring its most senior employees who receive restricted stock units to abide by Restrictive Covenants Agreements, which include non-disclosure covenants; and (3) ensuring limited access to the information.

203.    The trade secrets and confidential information at issue derive independent economic value (actual or potential) from not being generally known to, and not being readily ascertainable though proper means by, another person who could obtain economic value from the disclosure of such information.  Guy Carpenter has not consented to disclosure of its trade secrets and confidential information.  The trade secrets and confidential information at issue also provide Guy Carpenter with a significant competitive advantage in the reinsurance broker business,

including the specialized MGA market.

204.    Howden is a competitor of Guy Carpenter.

205.    Defendants misappropriated Guy Carpenter's trade secrets and confidential information by disclosing them to Howden and/or using them without Guy Carpenter's consent. Specifically, Defendants used and/or provided to Howden Guy Carpenter's trade secrets and confidential information—including information about clients, prospective clients, growth opportunities, competitive pricing, and terms and conditions of client contracts—and used Guy Carpenter trade secrets and confidential information in order to contact current or potential Guy Carpenter clients to solicit their business for Howden.  In addition, Defendants used confidential and proprietary information about GC Access's workforce (*i.e.*, information about employees' relative strengths and potential, various areas of expertise, and relationships with current or potential clients) and/or provided this information to Howden in order to solicit Guy Carpenter employees to end their employment at Guy Carpenter and join Howden.

206.    Defendants' unauthorized use and disclosure of Guy Carpenter's trade secrets and confidential information violates their Agreements and the Restrictive Covenants Agreements executed by Jameson, Beard, Durbin, and Wilson.  These trade secrets and confidential information were provided to Defendants in confidence, and their unauthorized use of these trade secrets and confidential information for the benefit of Howden and disclosure of that information to Howden violates Defendants' common-law duties to Guy Carpenter.

207.    As a direct and proximate result of Defendants' misappropriation of trade secrets and confidential information, Guy Carpenter has suffered damages, including, but not limited to, damages from lost revenue, lost business opportunities, loss of goodwill, harm to its reputation, and harm to customer relationships and customer prospects.  Moreover, Defendants' misconduct

was willful, wanton, and outrageous, and therefore entitles Guy Carpenter to punitive damages.

208.    Guy Carpenter is also being irreparably harmed by Defendants' misappropriation of trade secrets and confidential information and is therefore entitled to preliminary and permanent injunctive relief.

**COUNT VIII**
**Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.***
**(*As Against All Defendants*)**

209.    Guy Carpenter repeats and re-alleges Paragraphs 1 through 208 of this Complaint as if fully set forth herein.

210.    Guy Carpenter owns and possesses certain trade secret information related to its business, as detailed above and as defined by the Defend Trade Secrets Act, 18 U.S.C. § 1839(3).

211.    Guy Carpenter's trade secret information is related to services used, or intended for use, in interstate commerce because Guy Carpenter's business spans the United States.

212.    These trade secrets are not generally known or readily ascertainable outside of Guy Carpenter.  To the extent any subset of information incorporated into these trade secrets were publicly available, the compilation of the information is not.

213.    Guy Carpenter made reasonable efforts to keep such trade secret information secret and confidential, including, but not limited to, (1) requiring that the Departing Employees sign confidentiality and non-disclosure agreements covering such trade secrets; (2) requiring its most senior employees to abide by Restrictive Covenants Agreements related to restricted stock units; and (3) ensuring limited access to the information.

214.    Guy Carpenter has spent substantial time and resources developing its trade secrets.

215.    The trade secret information at issue derives independent economic value (actual

or potential) from not being generally known to, and not being readily ascertainable though proper means by, another person who could obtain economic value from the disclosure of such information.  Guy Carpenter has not consented to disclosure of its trade secrets.  The trade secrets at issue also provide Guy Carpenter with a significant competitive advantage in the reinsurance broker business, including the specialized MGA market.

216.    Howden is a competitor of Guy Carpenter.

217.    Defendants misappropriated Guy Carpenter's trade secrets by disclosing them to Howden and/or using them without Guy Carpenter's consent.  Specifically, Defendants used and/or provided to Howden Guy Carpenter's trade secrets—including information about clients, prospective clients, growth opportunities, competitive pricing, and terms and conditions of client contracts—and used Guy Carpenter trade secrets and in order to contact current or potential Guy Carpenter clients to solicit their business for Howden.  In addition, Defendants used confidential and proprietary information about GC Access's workforce (*i.e.*, information about employees' relative strengths and potential, various areas of expertise, and relationships with current or potential clients) and/or provided this information to Howden in order to solicit Guy Carpenter employees to end their employment at Guy Carpenter and join Howden.

218.    Defendants' unauthorized use and disclosure of Guy Carpenter's trade secrets violates their Agreements and the Restrictive Covenants Agreements executed by Jameson, Beard, Durbin, and Wilson.  These trade secrets were provided to Defendants in confidence, and their unauthorized use of these trade secrets for the benefit of Howden and disclosure of that information to Howden violates Defendants' duties to Guy Carpenter.  Defendants' misappropriation and use of Guy Carpenter's trade secrets was intentional, knowing, willful, malicious, fraudulent, and oppressive.

219.   As a direct and proximate result of Defendants' misappropriation of trade secrets, Guy Carpenter has suffered damages, including, but not limited to, damages from lost revenue, lost business opportunities, loss of goodwill, harm to its reputation, and harm to customer relationships and customer prospects.

220.   As a direct and proximate result of Defendants' misappropriation of Guy Carpenter's trade secret information, Defendants have been unjustly enriched and Guy Carpenter is entitled to damages for such unjust enrichment in an amount to be proven at trial.

221.   Moreover, Defendants' misappropriation of Guy Carpenter's trade secret information was willful and malicious.  Guy Carpenter is thus entitled to exemplary damages in an amount up to twice actual damages awarded under 18 U.S.C. § 1836(b)(3)(C).

222.   Guy Carpenter is also being irreparably harmed by Defendants' misappropriation of trade secrets and is therefore entitled to preliminary and permanent injunctive relief.

## COUNT IX
### Tortious Interference with Existing and Prospective Business Relationships
### (*As Against All Defendants*)

223.   Guy Carpenter repeats and re-alleges Paragraphs 1 through 222 of this Complaint as if fully set forth herein.

224.   Defendants have detailed knowledge concerning the business relationships that exist between Guy Carpenter and its clients and potential clients.

225.   Defendants, directly or indirectly, intentionally and with malice, and without privilege or justification, interfered with Guy Carpenter's existing and prospective business relationships, causing existing and prospective clients to leave Guy Carpenter using unfair or improper means and/or with the intent to interfere with such relationships.

226.   By their wrongful actions, Defendants have knowingly misappropriated Guy

Carpenter's confidential information and trade secrets for use in Howden's business and have engaged in unfair competition with Guy Carpenter.

227.    As a direct and proximate result of the loss of existing and prospective business relationships, Guy Carpenter has suffered damages, including, but not limited to, damages from lost revenue, lost business opportunities, loss of goodwill, harm to its reputation, and harm to customer relationships and customer prospects.  Moreover, Defendants' misconduct was willful, wanton, and outrageous, and therefore entitles Guy Carpenter to punitive damages.

228.    Guy Carpenter is also being irreparably harmed by Defendants' tortious interference and is therefore entitled to preliminary and permanent injunctive relief.

## COUNT X
## Unfair Competition
### (*As Against All Defendants*)

229.    Guy Carpenter repeats and re-alleges Paragraphs 1 through 228 of this Complaint as if fully set forth herein.

230.    Defendants have acted in bad faith and have engaged in unfair competition against Guy Carpenter by, among other things, willfully breaching their obligations to maintain Guy Carpenter's confidential, proprietary and trade secret information, by breaching their duty of loyalty to Guy Carpenter, and by misappropriating Guy Carpenter's confidential, proprietary and trade secret information.

231.    Defendants undertook the foregoing acts in order to gain an unfair competitive advantage for themselves and their new employer, Howden, over Guy Carpenter.

232.    By their wrongful actions, Defendants have knowingly and deliberately misappropriated Guy Carpenter confidential information and trade secrets for use in Howden's business and have engaged in unfair competition with Guy Carpenter.

233.     As a direct and proximate result of Defendants' unfair competition, Guy Carpenter has been and continues to be injured in its business and property, including, but not limited to, damages from lost revenue, lost business opportunities, loss of goodwill, harm to its reputation, and harm to customer relationships and customer prospects.

234.     Guy Carpenter is also being irreparably harmed by Defendants' unfair competition and is therefore entitled to preliminary and permanent injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, Guy Carpenter respectfully requests the following relief:

A.     A judgment in favor of Guy Carpenter as to all claims;

B.     Monetary damages for Defendants' breaches of contract, breaches of fiduciary duty, misappropriation of trade secrets and/or confidential information, tortious interference with existing and prospective business relationships, and unfair competition, including, but not limited to, actual, consequential, and/or incidental damages;

C.     Injunctive relief, preliminarily during the pendency of this action and permanently thereafter, including but not limited to:

1.     Enjoining Defendants from violating the client non-solicitation covenants in the Agreements and the Restrictive Covenants Agreements executed by Jameson, Beard, Durbin, and Wilson;

2.     Enjoining Defendants from violating the employee non-solicitation covenants in the Agreements and the Restrictive Covenants Agreements executed by Jameson, Beard, Durbin, and Wilson;

3.      Enjoining Defendants from using and/or disclosing any of Guy Carpenter's Confidential Information and Trade Secrets, as defined in the Agreements and the Restrictive Covenants Agreements executed by Jameson, Beard, Durbin, and Wilson;

4.      Ordering Defendants to promptly return to Guy Carpenter or destroy any and all Guy Carpenter Confidential Information and Trade Secrets, as defined in the Agreements and the Restrictive Covenants Agreements executed by Jameson, Beard, Durbin, and Wilson, in Defendants' possession;

5.      Enjoining Defendants from misappropriating or using Guy Carpenter's trade secrets under the Defend Trade Secrets Act and New York common law;

6.      Enjoining Defendants from interfering in Guy Carpenter's existing and prospective business relationships; and

7.      Enjoining Defendants from engaging in unfair competition with Guy Carpenter.

D.      Liquidated damages for Jameson's, Beard's, Durbin's, and Wilson's breaches of the Restrictive Covenants Agreements.

E.      Return of ill-gotten gains and all compensation, payment, distribution, or other remuneration paid to Defendants under the faithless servant doctrine;

F.      Punitive damages for Defendants' breaches of fiduciary duty, breaches of the faithless servant doctrine, misappropriation of trade secrets and/or confidential information, and tortious interference with existing and prospective business relationships;

G.      An award of attorneys' fees and costs in the maximum amount permitted and/or provided for by law and/or by contract; and

H.      Such other and further relief as this Court deems just and proper.


Dated:   New York, New York
         August 17, 2022                         GIBSON, DUNN & CRUTCHER LLP


                                       By: */s/ Christopher D. Belelieu*
                                           Christopher D. Belelieu

                                           Christopher D. Belelieu
                                           Grace E. Hart
                                           GIBSON, DUNN & CRUTCHER LLP
                                           200 Park Avenue
                                           New York, New York 10166
                                           Telephone:  (212) 351-4000
                                           Facsimile:  (212) 351-4035
                                           cbelelieu@gibsondunn.com
                                           ghart@gibsondunn.com

                                           Jason C. Schwartz*
                                           GIBSON, DUNN & CRUTCHER LLP
                                           1050 Connecticut Avenue, N.W.
                                           Washington, DC 20036
                                           Telephone:  (202) 855-8500
                                           Facsimile:  (202) 467-0539
                                           jschwartz@gibsondunn.com

                                           Karl G. Nelson*
                                           GIBSON, DUNN & CRUTCHER LLP
                                           2001 Ross Avenue
                                           Suite 2100
                                           Dallas, TX 75201
                                           Telephone:  (214) 698-3100
                                           Facsimile:  (214) 571-2900
                                           knelson@gibsondunn.com

                                           **pro hac vice application forthcoming*


                                           *Attorneys for Plaintiff Guy Carpenter &
                                           Company LLC*